# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Bingham*, 2013 IL App (4th) 120414

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JULIANNA M. BINGHAM, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0414 |
| Filed | April 2, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's judgment finding that defendant was a sexually dangerous person beyond a reasonable doubt and committing her to the Department of Corrections was reversed, notwithstanding the testimony establishing that defendant had serious difficulty controlling her sexual behavior and engaged in one incident with a teacher that constituted a "sex offense," since the single incident was insufficient to establish a propensity to commit such acts and the State did not prove defendant had propensities to engage in the sexual assault or molestation of children. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 09-CF-1508; the Hon. Timothy J. Steadman, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Monica Hawkins, of Hawkins & Root, P.C., of Decatur, for appellant. |
|---|---|
| | Jack Ahola, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion. Justices Appleton and Pope concurred in the judgment and opinion. |

## OPINION

¶ 1    In January 2011, the State filed a petition to have defendant, Julianna Bingham (born March 30, 1992), declared a sexually dangerous person under the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/1.01 to 12 (West 2010)). The trial court found defendant to be a sexually dangerous person beyond a reasonable doubt and appointed the Director of the Illinois Department of Corrections (Department) as her guardian. The court ordered defendant to remain committed to the Department "until or unless [she] is recovered and released."

¶ 2    Defendant appeals, arguing the State did not prove she is a sexually dangerous person beyond a reasonable doubt. We agree with defendant and reverse the trial court's judgment.

¶ 3                          I. BACKGROUND

¶ 4    In September 2009, the State charged defendant with aggravated battery, a Class 3 felony (720 ILCS 5/12-4(b)(3), (e)(1) (West 2008)), alleging defendant knowingly caused bodily harm to Michael Mose, her high school principal, while located on school grounds. In September 2010, defendant pleaded guilty, and the trial court sentenced her to 24 months' probation.

¶ 5    In January 2011, the State filed a petition to revoke defendant's probation, alleging defendant violated her probation when she committed a battery, a Class A misdemeanor (720 ILCS 5/12-3(a)(2), (b) (West 2010)) against Katie Cafin (born in 1994), by placing her hand on Cafin's buttocks.

¶ 6    In July 2011, the State filed a petition to have defendant declared a sexually dangerous person. At the time the State filed its petition, defendant was 19 years old. As the basis for its petition, the State alleged defendant engaged in the following sexual acts: (1) in 2005, she touched the buttocks of her female cousin and her male cousin's girlfriend; (2) in April and September 2006, she fondled the buttocks of two of her female schoolmates; (3) in March to October 2006, while staying in a group home, she slapped a female peer on her buttocks

and poked her breasts; (4) in October 2006, during a sex-offender-specific evaluation, she flirted with her female psychiatrist and asked her if she was a lesbian; (5) in March 2007, while in another group home, she pulled the shower curtain open on a peer while she was showering and "inappropriately" grabbed her; (6) in January 2010, she grabbed her teacher by the neck, pushed her into a chair, kissed her, and grabbed her breast; and (7) in January 2011, she grabbed Cafin's buttocks.

¶ 7     In April 2012, the trial court held a hearing on the State's petition. Dr. Lawrence Jeckel testified as an expert in forensic psychiatry. Jeckel explained, in court-ordered evaluations on potentially sexually dangerous persons, he generally gathers police reports, the psychiatric history, and the family history of a patient and performs a clinical evaluation of the patient to make a diagnosis and "draw conclusions that will guide the [trial] [c]ourt."

¶ 8     Jeckel testified he interviewed defendant for one hour in August 2011. To Jeckel's knowledge, defendant has never had sex-offender-specific treatment but has had "much psychiatric treatment." Respondent's parents had tried medications, mood stabilizers, and antipsychotics. Jeckel's evaluation revealed defendant's "affects to be somewhat diminished" but defendant was not "acutely psychotic" or "acutely paranoid." Jeckel reviewed an evaluation done in North Carolina, which concluded defendant "defiantly lacked victim empathy" and was not suffering from a mental illness but she had antisocial personality disorder. Jeckel diagnosed defendant as having "mixed personality disorder" with "many borderline features of borderline personality disorder[ ] and *** some antisocial qualities." Jeckel testified defendant "cannot process personal responsibility" and possesses an "intense sexualized idealization."

¶ 9     A review of defendant's mental history revealed defendant was "overly aggressive" and "uncomfortable with being a girl." Over time, defendant became "more aggressive, more unpredictable, more agitated, [and] more labile." Her recent mental history reflected "irrational outbursts of anger."

¶ 10     In regard to defendant's educational history, Jeckel testified defendant "ha[d] many learning deficits[,] [h]er reading ability [was] a third grade level[,] [and her] [w]riting was poor." Defendant's intelligence score was between 78 to 80, which Jeckel did not believe "quite qualifie[d] as mental retardation" but which indicated defendant had "some limited intellectual ability."

¶ 11     On cross-examination, Jeckel explained his determination defendant espoused a criminal sexual propensity was based on "a long pattern of [defendant] *** aggressively asserting her lesbian identity." Jeckel admitted this pattern of behavior was made known to him through reports supplied by other people, not through his own evaluation of defendant. Jeckel testified about two of the incidents made known to him through outside reports.

¶ 12     Jeckel first testified about the incident that led to the State filing the petition to have defendant committed as sexually dangerous. Defendant was staying at the Grace House "because she had no where else to stay." Cafin was stacking cans in the kitchen cabinet when defendant "came up from behind her and placed one of her hands on [Cafin's] buttocks." Cafin also reported defendant had looked down her shirt. Defendant told Jeckel she did not touch Cafin's buttocks or look down her shirt, and Cafin "didn't like her because she thought

[defendant] was a lesbian."

¶ 13    Jeckel next testified about an incident involving defendant and her teacher, Ashley Guntol. On January 15, 2010, the following events took place:

"[Defendant] stood up from her chair, walked over to the other side of the desk, grabbed the collar area *** of the teacher, forced her to sit back down, placed her hand on the collar neck area, and pressed her lips against the teacher, and tried to force her tongue into her mouth, *** and also reached down with her hand inside the teacher's shirt."

Jeckel testified defendant told him Guntol asked defendant to "come to the desk in front of her so she could see her pretty face." Defendant told Jeckel "she liked [Guntol]" and could not understand why the police were called. Later, on cross-examination, Jeckel testified defendant "stated [her behavior] was wrong, but did not want to talk about it."

¶ 14    Jeckel further testified about (1) the 2009 incident involving defendant in which she was charged with aggravated battery for biting and spitting on her high school principal, Mose, and (2) an incident in 2006 in which defendant attacked her father with a knife. Neither incident was sexual in nature.

¶ 15    Jeckel found defendant met the criteria for a sexually dangerous person. Jeckel opined defendant's mental disorder "predisposed her to engage in recurrent improper sexual and aggressive activity with other women" and caused a "criminal propensity to the commission of sex offenses." Without "some form of treatment," defendant would engage in sexually dangerous behavior in the future.

¶ 16    Dr. Terry Killian testified he interviewed defendant in October 2011 for approximately 2 1/2 hours. In evaluating defendant, Killian used police reports, information provided by defendant's parents, past medical and mental evaluations, and his personal interview with defendant. Killian diagnosed defendant with attention deficit hyperactivity disorder, antisocial personality disorder, and a possible sexual identity disorder.

¶ 17    Killian testified defendant had engaged in 12 separate incidents of sexual conduct involving 9 different victims. Some of these incidents were reported by defendant's parents. Killian further explained, "I did not assume in doing this evaluation that all 12 of those incidents are exactly as reported, that all 12 of them, actually[ ] occurred. I'm not in a position to say, yes, this occurred."

¶ 18    Killian asked defendant about the incident with Guntol. Defendant admitted kissing Guntol and trying to put her tongue in Guntol's mouth but denied pushing Guntol down into her chair. Killian stated he asked defendant if she grabbed Guntol's breast and her reply was " 'well, yeah, I grabbed her boob.' " Killian testified defendant was "rather dismissive" about grabbing Guntol's breast.

¶ 19    Killian testified about the incident at Grace House. Defendant denied intentionally touching Cafin. She told Killian she was falling and accidently touched Cafin while trying to brace herself.

¶ 20    Killian testified the disorders with which he diagnosed defendant "are coupled with [a] criminal propensity to the commission of sex offenses." The prosecutor asked Killian if he formed an opinion as to whether defendant had a mental disorder that results in her having

serious difficulty controlling her behavior, and he responded, "Yes." Killian did not believe defendant could control her sexual behavior and described her as "impulsive." He explained defendant "defiantly lack[ed] remorse," based on his observations and a 2006 evaluation of defendant, performed in North Carolina. Killian opined defendant had demonstrated propensities toward acts of sexual molestation of others and was substantially likely to engage in sex offenses if not confined.

¶ 21    Guntol testified she is a special education teacher. On January 15, 2010, she was working in a "one on one situation" with defendant. Defendant was reading out of a textbook, sitting directly across from Guntol. Guntol provided defendant with "verbal praise [for] how well she was doing." Defendant got out of her seat and moved toward Guntol, who stood up in response to defendant's movement. Defendant then "grabbed [Guntol] by the neck with both of her hands and pushed [her] down into the chair." Defendant kissed Guntol and "tried to stick her hand down into [Guntol's] shirt," where she did not "actually get underneath [her] bra, but she was trying to do that." As Guntol tried to tell a social worker what defendant had just done, defendant "slapped" Guntol on her buttocks "in front of staff and peers."

¶ 22    Officer Semaj Allen of the Decatur police department testified on January 15, 2010, he was working at defendant's school. Allen spoke with Guntol after the incident with defendant. He observed Guntol was "visibly shaken" and had "redness around her neck area."

¶ 23    Cafin testified to the incident at Grace House. Cafin was 17 when she was staying at Grace House with defendant. Cafin testified defendant grabbed her buttocks while she was in the kitchen, reaching for a can of soup in the cabinet. Cafin told defendant to stop and she did. On cross-examination, Cafin admitted she did not know if defendant had intentionally grabbed her buttocks. She also testified she thought defendant looked down her shirt, but she was not positive if defendant had in fact done so. Later the same evening, defendant asked Cafin to get on the bed with her. Cafin told defendant she would not get on the bed with her and left the room. Cafin did not have any further contact with defendant that night.

¶ 24    Chris Bingham, defendant's father, testified he, his wife, their son and other daughter, and defendant lived in North Carolina until 2008 when they moved to Decatur, Illinois. Defendant "had a lot of problems with people; adults, authority figures and other children." Defendant attacked him with a knife when she was 13. Bingham pressed charges because something "needed to be done to get [defendant] into the system because [they] weren't having any luck getting any help from anyone." Defendant went into a group home in 2005 and "except for a few months she's been in" group homes since then, throughout North Carolina, South Carolina, and Illinois. Defendant struggled with gender identity issues; she tried to "urinate standing up," "would not wear girl clothes," and "loved sports." These issues were discussed in defendant's counseling and therapy over the years. Defendant had never undergone sex-offender-specific treatment.

¶ 25    After hearing all the testimony, the trial court found defendant to be a sexually dangerous person. The court found (1) defendant had suffered from a mental disorder for a period of more than one year at the filing of the petition. In considering whether defendant had (2) demonstrated propensities toward acts of sexual assault, the court explained:

"There's been a lot of evidence about violent outbursts not of a sexual nature. So leaving those aside, the court will focus on the sexual nature of any conduct we heard about by way of the evidence today. When you boil it down, there's the incident with the teacher, Ms. Guntol. And the incident at [Grace] House with the young lady there. Then we have some testimony from Doctor Killian about 12 other sexual incidents. Now I don't know any details whatsoever about those incidents. I don't know what happened or what didn't happen. What I do know is we do have very, two very highly qualified psychiatrists who have a lot of experience under the Sexually Dangerous Persons Act making evaluations and recommendations. They both come to the same conclusion that, yes, the [d]efendant does exhibit these propensities."

In finding defendant (3) had a propensity to commit sexual offenses in the future, the court made the following remarks:

"We did have the interview with Doctor Killian. During the earlier stages of that interview in which [d]efendant made some statements about her inability to control impulsive sexual behavior and I think that's important for the court to keep in mind in arriving at a decision."

¶ 26    The trial court ordered defendant's commitment to the Department "until or unless [she] is recovered and released" and appointed the Director of the Department as her guardian.

¶ 27    This appeal followed.

¶ 28                                II. ANALYSIS

¶ 29    On appeal, defendant argues the State did not prove she is a sexually dangerous person beyond a reasonable doubt. In particular, defendant argues the State did not prove (1) the existence of a mental disorder, (2) a propensity to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or the molestation of children. We address defendant's arguments in turn.

¶ 30    Under the SDPA, the State must prove defendant (1) has a mental disorder which has existed for more than one year prior to the filing of a sexually-dangerous-person petition, (2) exhibits criminal propensities to the commission of sex offenses, and (3) has demonstrated propensities toward acts of sexual assault or the molestation of children. 725 ILCS 205/1.01 (West 2010). In other words, the State must show defendant's mental disorder "is associated with criminal propensities to the commission of sex offenses" and defendant has actually demonstrated such propensity. *People v. Masterson*, 207 Ill. 2d 305, 318-19, 798 N.E.2d 735, 743 (2003).

¶ 31                             A. Standard of Review

¶ 32    In reviewing the trial court's findings concerning the State's petition, we "must consider all of the evidence introduced at trial in the light most favorable to the State and then determine whether any rational trier of fact could have found the essential elements to be proven beyond a reasonable doubt." *People v. Bailey*, 405 Ill. App. 3d 154, 171, 937 N.E.2d 731, 745 (2010). We will reverse the court's findings only if the evidence is so improbable

as to raise a reasonable doubt defendant is a sexually dangerous person. *Bailey*, 405 Ill. App. 3d at 171, 937 N.E.2d at 745.

¶ 33                                   B. Mental Disorder

¶ 34    Prior to 2006, the SDPA did not define "mental disorder." In 2002, the United States Supreme Court held substantive due process prohibits a defendant from being committed as a sexually dangerous person without a showing the defendant has "serious difficulty" controlling his behavior. *Kansas v. Crane*, 534 U.S. 407, 413 (2002). In 2003, in an effort to adhere to the constitutional standards pronounced in *Crane*, our supreme court concluded the definition for "mental disorder" provided in the Sexually Violent Persons Commitment Act (SVPA) (725 ILCS 207/1 to 99 (West 2000)) should be read into the SDPA. *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749. The definition of mental disorder in the SVPA at that time, however, did not contain language concerning a defendant's ability to control his behavior. This language was read into the SVPA when the *Masterson* court construed the term " 'mental disorder' " as it applied to the SDPA to mean "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in the commission of sex offenses and results in *serious difficulty* controlling sexual behavior." (Emphasis added.) *Masterson*, 207 Ill. 2d at 329, 798 N.E.2d at 749.

¶ 35    In 2006, following *Masterson*, the legislature amended the SDPA to include a definition of "mental disorder." The SDPA's current definition of mental disorder is identical to the SVPA's definition as it appeared prior to *Masterson* and as it appears now. It defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 205/4.03 (West 2010). The SDPA's current definition does not contain the "serious difficulty" language the *Masterson* court read into the definition prior to the amendments. However, because the court incorporated such language into the SVPA's definition of mental disorder when it adopted such definition for the SDPA, and the SVPA's definition has not changed, we conclude both definitions still require a showing a defendant has "serious difficulty" controlling his sexual behavior. To conclude otherwise would not comport with the United States Supreme Court's minimum standards of substantive due process for commitment proceedings.

¶ 36    Thus, to prove defendant has a mental disorder as defined by our supreme court in *Masterson*, the State must show (1) defendant has "serious difficulty" controlling her sexual behavior and (2) the finder of fact must (a) make a finding of sexual dangerousness premised upon the elements of section 1.01 of the SDPA and (b) accompanied by an explicit finding it is "substantially probable" the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined. We discuss each in turn.

¶ 37                      1. *Serious Difficulty Controlling Sexual Behavior*

¶ 38    In the instant case, the State was required to prove defendant had serious difficulty controlling her sexual behavior. We conclude the State presented sufficient evidence on this matter.

¶ 39    Jeckel testified defendant "cannot process personal responsibility" and possesses an "intense sexualized idealization." Jeckel diagnosed defendant with mixed personality disorder with "some antisocial qualities." He explained people with borderline personality disorder "tend to be impulsive" and defendant, in particular, could not "contain her behavior." Jeckel opined defendant's mental disorder "predisposed her to engage in recurrent improper sexual and aggressive activity with other women."

¶ 40    Killian testified he did not believe defendant could control her sexual behavior because she suffered from antisocial personality disorder. He explained defendant "defiantly lack[ed] remorse," based on his observations and a 2006 evaluation of defendant. Killian described defendant's behavior as "impulsive." We conclude such testimony is sufficient to support a finding defendant has serious difficulty controlling her sexual behavior.

¶ 41                    2. *Substantial Probability Finding*

¶ 42    Under *Masterson*, the trial court has to make an "*explicit finding* that it is '*substantially probable*' the person subject to the commitment proceedings will engage in the commission of sex offenses in the future if not confined." (Emphases added.) *Masterson*, 207 Ill. 2d at 330, 798 N.E.2d at 749. Although Jeckel and Killian opined it was substantially probable defendant would commit sex offenses in the future, the record shows the trial court did not make the requisite finding. Such an omission constitutes reversible error.

¶ 43                    C. Propensity to the Commission of Sex Offenses

¶ 44    Defendant also argues the State did not prove she exhibits propensities to the commission of sex offenses. We agree.

¶ 45    The State must show defendant's mental disorder is "coupled with criminal propensities to the commission of sex offenses." 725 ILCS 205/1.01 (West 2010). Whether defendant has a propensity to the commission of sex offenses is determined by what constitutes a "propensity" and what constitutes a "sex offense," and whether defendant's behavior falls within that definition.

¶ 46    A "propensity" is "an often intense natural inclination or preference." Merriam Webster's Collegiate Dictionary 932 (10th ed. 2000). This court has concluded the State may admit evidence of a defendant's prior criminal acts to prove a propensity to commit acts in pursuit of a defendant's sexual urges. See *People v. Hancock*, 329 Ill. App. 3d 367, 379, 771 N.E.2d 459, 468 (2002) (concluding the State proved the defendant's "propensity to commit criminal acts in pursuit of his sexual urges" by admitting evidence defendant broke into homes for the purpose of (1) masturbating over children and (2) furthering his homosexual urges).

¶ 47    The SDPA does not define "sex offense." Thus, we look to the definitions found in article 12 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-12 (West 2010)) for guidance. Article 12 relates to offenses involving "bodily harm" and provides, in relevant part, definitions of "sexual penetration" and "sexual conduct." While "sexual penetration" as defined in article 12 obviously qualifies as a "sex offense," for our purpose of ascertaining how broad the scope of "sex offense" is, we look to the definition of "sexual conduct." The

Criminal Code defines "sexual conduct" as "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12-12(e) (West 2010).

¶ 48    As evidence of defendant's criminal propensity to the commission of sex offenses, the State offered the testimony of Jeckel, Guntol, and Killian. Jeckel testified defendant grabbed Guntol's shirt, forced her to sit down, kissed her, and reached inside her shirt. Guntol testified defendant "grabbed [her] by the neck with both of her hands and pushed [her] down into the chair." Defendant kissed Guntol and "tried to stick her hand down into [Guntol's] shirt," where she did not "actually get underneath [her] bra, but she was trying to do that." Although Jeckel and Guntol did not affirmatively testify defendant grabbed her breast, the trier of fact could have inferred from defendant's act of sticking her hand down Guntol's shirt she made contact with her breast. Further, Killian testified defendant admitted during her evaluation with Killian she kissed Guntol and grabbed Guntol's breast. Such behavior constitutes a "sex offense."

¶ 49    We have thus concluded defendant's behavior constituted a sex offense. However, we must still decide whether the State's evidence of the single incident with Guntol was sufficient to prove defendant has a propensity to commit acts in pursuit of her sexual urges. Although *Hancock* speaks to what evidence may be admitted and relied upon to prove propensities, it does not address whether evidence of one act is sufficient. We conclude it is not, and where, as here, the State has only introduced evidence of one act to prove a propensity to commit sex offenses, the State has not met its burden.

¶ 50            D. Demonstrated Propensities Toward Acts of Sexual
                     Assault or Molestation of Children

¶ 51    Defendant's final contention on appeal is the State failed to prove defendant demonstrated propensities toward acts of sexual assault or sexual molestation of children. We agree.

¶ 52    Our supreme court has concluded the SDPA "requires more than the proof of mere 'propensity'; it also requires that the State prove that the defendant has 'demonstrated' this propensity. This language can only mean that the State must prove at least one act of or attempt at sexual assault or sexual molestation." *People v. Allen*, 107 Ill. 2d 91, 105, 481 N.E.2d 690, 697 (1985). This, however, does not mean the State has to prove multiple sex crimes. *Allen*, 107 Ill. 2d at 105, 481 N.E.2d at 697. We conclude the State did not present evidence defendant sexually assaulted or attempted to sexually assault any person; nor did it show defendant sexually molested any children.

¶ 53    The SDPA does not define "sexual assault." Thus, we are guided by the definition of "criminal sexual assault" found in the Criminal Code (720 ILCS 5/12-13(a) (West 2010)). In relevant part, a person "commits criminal sexual assault if he or she: (1) commits an act of sexual penetration by the use of force or threat of force; or (2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." 720 ILCS 5/12-13 (West 2010). The Criminal

Code defines "sexual penetration," in part, as

> "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio, or anal penetration." 720 ILCS 5/12-12(f) (West 2010).

The record fails to show defendant penetrated or attempted to sexually penetrate anyone. Therefore, the State failed to prove defendant demonstrated propensities toward acts of sexual assault.

¶ 54    In regard to demonstrated propensities toward acts of sexual molestation of children, the SDPA is silent on what constitutes sexual molestation. Additionally, we have found only one case that sought to define sexual molestation. In *People v. Beksel*, 125 Ill. App. 2d 322, 328, 261 N.E.2d 40, 44 (1970), the Second District explained "acts of sexual molestation of children are acts which basically involve the incapacity of the victim to consent to primarily consensual acts (molestation)." (*Beksel* also determined that "children" for the purposes of the SDPA included any child under the age of 18. *Beksel*, 125 Ill. App. 2d at 329, 261 N.E.2d at 44.)

¶ 55    For additional clarity, we find the Illinois Administrative Code Rules of the Department of Children and Family Services and the Criminal Code instructive. The Illinois Administrative Code defines sexual molestation as "sexual conduct with a child when the contact, touching or interaction is used for arousal or gratification of sexual needs or desires." 89 Ill. Adm. Code 300.Appendix B, 21, (2011). As we previously explained, the Criminal Code defines "sexual conduct" as "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12-12(e) (West 2010). Combining these definitions, we conclude sexual molestation must involve an intentional or knowing touching or fondling of the child or accused, either directly or through clothing, of the *sex organs*, *anus*, or *breast* of the child or the accused for the purpose of arousal or gratification of sexual needs or desires.

¶ 56    Based on this definition, we conclude the State did not prove beyond a reasonable doubt defendant engaged in acts of sexual molestation of children. The State presented evidence of the incident with Guntol, who was an adult, as well as the testimony of Killian that defendant engaged in 12 separate incidents of sexual conduct involving 9 different victims. Killian did not testify concerning the "12 incidents" with any specificity as to who was involved, how old the victims were, when the incidents took place, or what alleged sexual conduct was involved. More detailed information surrounding these incidents was provided in Killian's evaluation of defendant, and to some extent, in Jeckel's evaluation. However, Killian and Jeckel's evaluations were never admitted into evidence. Moreover, when making its findings at the close of the hearing, the trial court explained it knew almost nothing about the 12 incidents:

> "When you boil it down, there's the incident with the teacher, Ms. Guntol. And the

incident at [Grace] House with the young lady there. Then we have some testimony from Doctor Killian about 12 other sexual incidents. Now I don't know any details whatsoever about those incidents. I don't know what happened or what didn't happen."

Thus, the only evidence the State presented concerning an intentional touching or fondling of a child was the incident at Grace House with Cafin.

¶ 57　　Cafin testified she was 17 when she was staying at Grace House. She said defendant grabbed her buttocks while she was in the kitchen, reaching for a can of soup in the cabinet. On cross-examination, Cafin admitted she did not know if defendant had intentionally grabbed her buttocks. She also testified she thought defendant looked down her shirt, but she was not positive if defendant had in fact done so. Killian testified defendant denied, during her evaluation, intentionally touching Cafin and told Killian she accidently touched Cafin while trying to brace herself from falling. Killian also reported defendant denied the touching was sexual in nature. Jeckel further testified defendant denied, during her evaluation, intentionally touching Cafin's buttocks or looking down Cafin's shirt. Based on this testimony, the State did not prove defendant intentionally touched Cafin's buttocks for the purpose of sexual arousal.

¶ 58　　Even if the State had proved an intentional touching, it did not prove every element of "sexual molestation." Defendant was accused of touching Cafin's buttocks, not her *sex organ*, *anus*, or *breast*. Defendant's conduct therefore did not rise to the level of sexual molestation as we have construed it under the SDPA.

¶ 59　　　　　　　　　　　　　　　III. CONCLUSION

¶ 60　　Defendant's conduct may have been chargeable under some provision of the Criminal Code, but the State did not prove beyond a reasonable doubt defendant is a sexually dangerous person under the SDPA. For the reasons stated, we reverse the trial court's judgment.

¶ 61　　Reversed.