# Illinois Official Reports

## Supreme Court

---

**People v. Bingham, 2014 IL 115964**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JULIANNA BINGHAM, Appellee. |
| Docket No. | 115964 |
| Filed | May 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Buttock-touching incidents are not sex offenses as defined by statute, and where only one attempt at what would qualify as such was shown, a finding of sexual dangerousness was properly reversed for insufficient evidence. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Macon County, the Hon. Timothy J. Steadman, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Jay Scott, State's Attorney, of Decatur (Michael A. Scodro and Carolyn E. Shapiro, Solicitors General, and Michael M. Glick and Katherine M. Doersch, Assistant Attorneys General, of Chicago, and Patrick Delfino, Robert J. Biderman, and David E. Mannchen, of the Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People. |
|---|---|
| | Monica Hawkins, of Decatur, for appellee. |
| Justices | CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion. Justices Freeman, Thomas, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    The circuit court of Macon County declared defendant, Julianna Bingham, to be a sexually dangerous person under the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/1.01 to 12 (West 2010)), and appointed the Director of the Illinois Department of Corrections (Department) as her guardian. Defendant was ordered to remain committed to the Department "until or unless [she] is recovered and released." The appellate court reversed the trial court's judgment. 2013 IL App (4th) 120414. We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. July 1, 2013). For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3    In September 2009, the State charged defendant with aggravated battery and alleged that defendant knowingly caused bodily harm to her assistant high school principal, Mike Mose, when she bit, spat on, and choked him. Defendant pleaded guilty and the court sentenced her to 24 months' probation. The trial court's order also required defendant to undergo a mental health evaluation.

¶ 4    In January 2011, the State petitioned the court to revoke defendant's probation. The petition alleged that defendant committed a battery when she placed her hand on 17-year-old Katie C.'s buttocks while staying at a group home called Grace House.

¶ 5    In July 2011, when defendant was nineteen, the State filed a petition to have her declared a sexually dangerous person. The petition relied on several allegations regarding defendant's past conduct: (1) in 2005, defendant's 11-year-old cousin stated that defendant touched her breasts and gave her "wedgies all the time"; (2) the same year, another cousin noted that defendant touched his girlfriend's buttocks and chest; (3) in 2006, defendant was adjudicated a

- 2 -

delinquent minor for two charges of assault for fondling the buttocks of two students at her school; (4) during a Sex Offender Specific Evaluation in 2006, defendant flirted with the therapist and asked her if she was a lesbian; (5) while staying in a group home in 2007, defendant inappropriately grabbed a female in the bathroom and pulled the shower curtain open on the female while she was showering; and (6) defendant made sexual advances toward a female teacher, Ashley Guntol, grabbing her neck and breast, pushing the teacher into a chair and pressing her lips and tongue into the teacher's mouth.

¶ 6        The trial court appointed Dr. Lawrence Jeckel and Dr. Terry Killian to each conduct a Sexually Dangerous Person evaluation and file a written report with the court. The court held a bench trial, and several individuals testified.

¶ 7        At the hearing, Dr. Jeckel testified regarding the court-ordered sexually dangerous person evaluation he conducted of defendant. Dr. Jeckel met with defendant for one hour and also reviewed police reports and notes from defendant's prior evaluations. He first testified regarding the time defendant placed her hand on the buttocks of Katie C. while living at the group home called Grace House. Katie C. reported that defendant "came up from behind her and placed one of her hands on her buttocks." Katie C. asked defendant not to do that and defendant stopped. Katie C. also testified that defendant was "looking down her shirt" and later that day, defendant asked Katie C. "to get on her bed with her."

¶ 8        Regarding the incident with Katie C., defendant told Dr. Jeckel that she and Katie C. "started playing around," but denied touching Katie C.'s buttocks and looking at Katie C.'s breasts. Defendant also stated that Katie C. did not like her because Katie C. thought defendant was a lesbian. Finally, defendant "claimed that she wasn't sexually drawn to minors."

¶ 9        Dr. Jeckel spoke with defendant about the time she choked, bit, and spat on her high school assistant principal, Mike Mose. Mose attempted to restrain defendant after defendant got into an altercation with another student after a verbal dispute over where to sit at lunch. Defendant told Dr. Jeckel that the other girl touched her leg and that she kneed the other girl to protect herself. Mose attempted to restrain defendant until the police arrived and defendant choked, bit, and spat on him. Justifying her actions against Mose, defendant claimed that Mose pushed her and started to fight her.

¶ 10       Next, Dr. Jeckel testified about defendant's sexual advances toward her teacher, Ashley Guntol. Guntol reported that defendant grabbed her neck and breast, pushed her into a chair, and pressed her lips and tongue into Guntol's mouth. Defendant said that Guntol told defendant to "come to the desk in front of her so she could see her pretty face." Defendant also said that "she kissed her because she liked her, and couldn't understand *** why the police were called." Dr. Jeckel testified that defendant told him that the attempted kiss "was wrong" but did not want to talk about it.

¶ 11       Dr. Jeckel testified that defendant "has some limited intellectual ability," "showed an inability to love," and was "overly aggressive, uncomfortable with being a girl." Additionally, Dr. Jeckel noted that "it's very difficult to control her behavior to protect her and others" and that defendant "cannot process personal responsibility" for her conduct.

¶ 12    Defendant told Dr. Jeckel that "[w]hen I see a girl that I like, I feel giddy and happy. I just can't restrain myself. It hasn't happened in jail because they're all ugly. If someone is beautiful, I am more likely to fall for them. I just can't restrain myself. It is very hard. Most days I think a lot about sex. I think of girlfriends who like me for who I am, and I would like them. It's not just the sex." Finally, Dr. Jeckel diagnosed defendant with borderline personality disorder with some antisocial qualities that "predisposed her to engage in recurrent improper sexual and aggressive activity with women." Dr. Jeckel testified that defendant's mental disorder existed for at least one year prior to July 13, 2011. Dr. Jeckel also opined that defendant's mental disorder causes a criminal propensity to the commission of sexual offenses and that defendant has demonstrated propensities toward acts of sexual molestation of children or other persons. Additionally, Dr. Jeckel noted that without treatment, defendant was likely to engage in sexually dangerous behavior in the future.

¶ 13    On cross-examination, Dr. Jeckel acknowledged that he had not interviewed any of the individuals involved in the above detailed incidents, but rather relied on police reports. Dr. Jeckel also agreed that defendant's only prior sexual behavior had been one kiss and that she was not sexually active at the time.

¶ 14    Dr. Killian testified next regarding his interview with defendant. When asked about the incident with Guntol, defendant admitted to trying to kiss her and grabbing her breast. Dr. Killian noted that defendant was "dismissive" during this discussion and acted as if her actions were not a "big deal."

¶ 15    With regards to her acts toward Katie C. at the group home, defendant again denied any intentional touching and said that she was falling and reached out to grab something when she "accidentally brushed up against Katie's buttocks."

¶ 16    During the interview, defendant stated, "I have a sexual addiction problem *** I like to think about sex." She indicated that she started hitting people on the butt because "nobody ever taught me that there was something wrong with that." Dr. Killian asked if she stopped when someone told her it was wrong and defendant replied "I tried many times, but it just kept going on. Like I would make sexual advances toward girls, smacking them on the butt, grabbing their boobs, something like that." Dr. Killian testified that it was his opinion that defendant "thought that by saying she had a sexual addiction *** she would go to some treatment center for a few months and then be released into the community." Dr. Killian stated that defendant "changed her story" after he informed her that having a sexual addiction actually made it more likely that she would be found sexually dangerous. Defendant then acknowledged that she had been told of the term "sexual addiction" by a jail counselor. While defendant still claimed to have a sexual addiction, she "backed off quite a bit from the intensity." At this point, she also noted, "I can stop if I really try." On cross-examination, Dr. Killian stated that he believed defendant said she had a sexual addiction because she thought it would help her get out of her case and that he "wouldn't take what she said about having a sexual addiction too seriously."

¶ 17    Dr. Killian testified that defendant had engaged in 12 separate incidents of sexual conduct involving 9 different victims, but acknowledged that he was "not in a position to say [the events] occurred" as many of the incidents were reported only by defendant's parents. Dr. Killian also agreed that all victims were within a few years of defendant's age and that she was

"not preying on small children." Dr. Killian found that defendant "took responsibility to a very limited extent. She admitted that there had been a lot of offenses. She also pretty angrily said that she was tired of people lying about her, and claimed that many of the allegations were false. *** But she did admit at one point that she had—had committed a lot of offenses."

¶ 18    Dr. Killian concluded that defendant "definitely has Attention Deficit Hyperactivity Disorder, and may have a sexual identity disorder, and definitely has an antisocial personality disorder." He described antisocial personality disorder as a disorder "in which the rights of others are repeatedly violated, typically, without remorse." In reaching this conclusion, Dr. Killian found defendant meets all or almost all of the following criteria: (1) failure to conform behavior to the rules of society; (2) deceitful; (3) impulsive; (4) irresponsible; (5) irritable and aggressive; (6) reckless disregard for safety of one's self or others; and (7) lack of remorse. Dr. Killian found defendant suffered from a mental disorder for at least one year prior to July 13, 2011, has a criminal propensity to the commission of sex offenses, and demonstrated propensities toward acts of sexual molestation of children or others. Finally, Dr. Killian stated that defendant "is substantially likely to engage in further sex offenses if not confined."

¶ 19    Mike Mose, the assistant principal of the high school, testified that he was called to break up a fight in the cafeteria involving defendant. When he arrived, he asked defendant to come with him to the office, but she refused. Eventually, defendant started walking out of the cafeteria and began to run. Mose stated that he "reached out to grab her arm and then at that time, [defendant] swung back at me and then I restrained her." Mose continued to hold her, but defendant "was struggling," spat in Mose's face, and bit him on the biceps.

¶ 20    Semaj Allen is a police officer for the City of Decatur and took defendant into custody after she attempted to kiss Guntol. Officer Allen testified that when they were taking defendant into custody, "she became physically resistant" and "ended up trying to kick *** the social worker." Defendant was "screaming and cursing at all of us *** and then she spat on [the social worker]."

¶ 21    Officer Harold Newingham was also present at the high school and assisted Officer Allen in restraining defendant. Officer Newingham testified that he observed defendant being "very combative and argumentative." He also stated that he observed a reddened area on Mose's arm that appeared to be a bite mark.

¶ 22    Katie C. testified regarding the incident at Grace House, which took place when Katie C. was 17 years old. Katie C. stated that she "was in the kitchen and [defendant] grabbed her buttocks." Upon further questioning, Katie C. indicated that defendant came up from behind Katie C. and grabbed Katie C.'s buttocks with a single hand. Katie C. asked defendant to stop and defendant stopped. On cross-examination, Katie C. admitted that she did not know if the touching was intentional. Later that same day, Katie C. was in the kitchen and spilled some crackers on the floor. Katie C. reached down to get the crackers and she believed that defendant might have looked down her shirt. Later in the evening, Katie C. was in a room with another girl and defendant asked Katie C. "to get on the bed." Katie C. said "no" and walked out of the room.

¶ 23    Ashley Guntol testified, discussing the incident between her and defendant in a classroom. Guntol, a 23-year-old teacher, was reading one-on-one with defendant, and Guntol praised

defendant for reading well. Defendant asked Guntol what she got for doing well and Guntol jokingly responded that defendant would get a cookie. At that point, defendant "stood up and came around [Guntol's] desk." Guntol "stood up as she was coming over" and defendant "grabbed [Guntol] by the neck with both of her hands and pushed [Guntol] down into the chair." Next, defendant "proceeded to try and kiss [Guntol]." Guntol attempted to keep her mouth shut, but she felt defendant's tongue on her teeth. Guntol said that she "finally got up and that's when she tried to stick her hand down into my shirt. She didn't actually get underneath my bra, but she was trying to do that." Guntol then testified that she "deescalated the situation" and was walking out of the room when defendant slapped her on the buttocks. Guntol did not initially report this last touching to the police because she was flustered and forgot.

¶ 24 Finally, defendant's father, Chris Bingham, testified. Chris first discussed defendant's history of behavioral problems and indicated that defendant has seen many psychologists. One day, when defendant was 13 years old and the family was living in North Carolina, defendant was cutting pills with a knife in the house. Defendant was being very loud and Chris reminded her that she was inside and defendant "turned on [him] and glared with the knife in her hand and holding it, not the way you would cut a pill." Defendant then "came at [him] with a knife in both hands to the center of [his] body." Chris was able to restrain defendant and take the knife away from her, and another family member called 911. After court proceedings and another attack by defendant on her middle school principal, teacher, and students, defendant was placed in a group home. The family later moved to Illinois, and defendant continued to experience problems.

¶ 25 At the conclusion of testimony, the trial court entered an order finding defendant to be a sexually dangerous person and appointed the Director as her guardian "until the respondent has recovered." The appellate court reversed the trial court's judgment finding: (1) the trial court failed to make the required explicit finding that it is substantially probable defendant will engage in the commission of sex offenses in the future if not confined; (2) the State failed to prove that defendant exhibits propensities to the commission of sex offenses; and (3) the State failed to prove that defendant demonstrated propensities toward acts of sexual assault or molestation of children.

¶ 26                                    ANALYSIS

¶ 27 To classify defendant as a sexually dangerous person under the SDPA, the State must prove the defendant has (1) a mental disorder existing for at least one year prior to the filing of the petition; (2) criminal propensities to the commission of sex offenses; and (3) demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. 725 ILCS 205/1.01 (West 2010). Only the second two elements are at issue in this appeal, as the parties agree that defendant had a mental disorder for at least one year prior to the filing of the petition.

¶ 28 The State argues that the appellate court erred in reversing the trial court's judgment. In its brief, the State maintains that the appellate court improperly concluded that the trial court was required to make an explicit finding that it is substantially probable that respondent will engage in the commission of sex offenses in the future if not confined, as required by *People v.*

*Masterson*, 207 Ill. 2d 305, 330 (2003). The State argues that Dr. Killian's testimony satisfies *Masterson*'s concerns. Next, the State contends that it proved that defendant exhibits criminal propensities to the commission of sex offenses. Finally, the State maintains it showed that defendant has committed or attempted at least one act of sexual assault or molestation of a child, and that one act is sufficient to show the demonstrated propensities element.

¶ 29    Defendant argues that *Masterson* requires an explicit finding that it is "substantially probable" the defendant will engage in the commission of sex offenses in the future if not confined. Additionally, defendant agrees with the appellate court's rulings that the State failed to show that defendant has criminal propensities to the commission of sex offenses or that defendant demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children.

¶ 30    "On appeal from a trial court or jury's ruling on a sexually-dangerous-person petition, the reviewing court must consider all of the evidence introduced at trial in the light most favorable to the State and then determine whether any rational trier of fact could have found the essential elements to be proven beyond a reasonable doubt." *People v. Bailey*, 405 Ill. App. 3d 154, 171 (2010).

¶ 31                              1. Substantial Probability Finding

¶ 32    First, we must determine whether the trial court was required to make an explicit finding that it is substantially probable defendant will engage in the commission of sex offenses in the future if not confined. In *Masterson*, 207 Ill. 2d at 330, this court stated, "a finding of sexual dangerousness premised upon the elements of section 1.01 of the SDPA [citation] must hereafter be accompanied by an explicit finding that it is 'substantially probable' the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined."

¶ 33    According to the State, Dr. Killian's opinion that defendant was " 'substantially likely' to commit further sex offenses if not confined" was sufficient to satisfy *Masterson*'s requirement. Additionally, the State notes the presumption that the trial court knows and follows the law. Applying this presumption, the State maintains that "the trial court could not have concluded other than it was substantially probable that respondent would commit sex offenses if not confined."

¶ 34    At oral argument, when asked why would this court "not require the trial court to make the explicit finding and not merely rely on the expert's testimony," the State conceded that "this court could require, could remand for an explicit finding *** we are not saying that it is not required, certainly *Masterson* does require it. We are just saying on this record it is plainly harmless because Dr. Killian used the appropriate standard. *** This court very well could remand for compliance with *Masterson*."

¶ 35    *Masterson* plainly requires an explicit finding, and the trial court erred by failing to make this explicit finding. However, we need not determine whether the lack of an explicit finding alone constitutes reversible error since we affirm the appellate court's order reversing the trial court's sexually dangerous person finding based on insufficient evidence, as stated below.

¶ 36                      2. Criminal Propensities to the Commission of Sex Offenses

¶ 37        Under the SDPA, the State must show the defendant's mental disorder is "coupled with criminal propensities to the commission of sex offenses." 725 ILCS 205/1.01 (West 2010). The appellate court found that the State failed to show the second element: that defendant exhibits criminal propensities to the commission of sex offenses. In *Masterson*, this court held that the State must show that it is "substantially probable" defendant "will engage in the commission of sex offenses in the future if not confined." *Masterson*, 207 Ill. 2d at 330.[1]

¶ 38        The SDPA does not define "sex offenses." The appellate court looked to definitions found in the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/1-1 *et seq.* (West 2010)) for guidance. The Criminal Code does not define "sex offenses," and instead the appellate court considered its definition of "sexual conduct." Under the Criminal Code, "sexual conduct" is defined as "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/12-12(e) (West 2010). Therefore, under the Criminal Code, the conduct must include the touching of a sex organ, anus, or breast. The appellate court looked to the testimony at trial to conclude that only the incident where defendant attempted to touch Guntol's breast included the touching of one of these body parts. Then, finding one incident insufficient to show a propensity to commit future acts, the appellate court found the evidence insufficient.

¶ 39        Relying on section 3 of the SDPA and citing a single line from the appellate court's decision in *People v. Lovett*, 234 Ill. App. 3d 645 (1992), the State first maintains that to establish a criminal propensity to commit future sex offenses, the underlying criminal case need not have a sexual component. Section 3 of the SDPA reads, "[w]hen any person is charged with a criminal offense and it shall appear to the Attorney General or to the State's Attorney of the county wherein such person is so charged, that such person is a sexually dangerous person, within the meaning of this Act, then the Attorney General or State's Attorney of such county may file with the clerk of the court in the same proceeding wherein such person stands charged with criminal offense, a petition in writing setting forth facts tending to show that the person named is a sexually dangerous person." 725 ILCS 205/3 (West 2010).

¶ 40        In *Lovett*, the appellate court considered section 3 and whether the criminal charge underlying the sexually dangerous person petition was required to be a sexual offense. *Lovett*, 234 Ill. App. 3d at 646. Noting that the SDPA uses the term "criminal offense" and "does not require the underlying criminal offense to be a sexual offense," the court concluded that the SDPA "merely requires that a person be charged with a criminal offense." *Id.*

---

[1] In 2013, the legislature codified this definition from *Masterson*, and currently, under section 4.05 of the SDPA, "For the purposes of this Act, 'criminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceeding will engage in the commission of sex offenses in the future if not confined." Pub. Act 98-88, § 5 (eff. July 15, 2013).

¶ 41     Section 3, however, dictates the requirements for when the State may file a sexually dangerous person petition in a criminal offense proceeding. Neither section 3 nor *Lovett* considers the requirement in section 1.01 that the State show that defendant has a criminal propensity to commit future sex offenses. Therefore, while the underlying crime need not be sexual for the State to file a sexually dangerous person petition, section 3 and *Lovett* are unrelated to the issue of whether the State has shown a criminal propensity to the commission of sex offenses.

¶ 42     Furthermore, the appellate court properly relied on definitions contained in the Criminal Code. "When a statute is unclear, a court may look to similar statutes as an aid to construction. [Citation.] It is presumed that statutes relating to the same subject are governed by one spirit and a single policy." *Masterson*, 207 Ill. 2d at 329; see also *People ex rel. Illinois Department of Corrections v. Hawkins*, 2011 IL 110792, ¶ 24 ("[W]e presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious. [Citation.] Thus, we may consider 'similar and related enactments, though not strictly *in pari materia*.' [Citations.]").

¶ 43     The second element requires a showing of a *criminal* propensity. The SDPA is not concerned merely with individuals with a mental disorder, but specifically those individuals with a mental disorder that are likely to commit future crimes. Therefore, the Criminal Code and the SDPA are governed by the same policy to prevent future criminal acts. The appellate court properly relied on the Criminal Code's definition of "sexual conduct" to define "sexual offense" under the SDPA when the legislature did not otherwise define the term.

¶ 44     The testimony detailed above reveals only one incident involving the attempted touching of a sex organ, anus, or breast. Guntol testified that defendant "tried to stick her hand down into my shirt." Guntol stated that defendant "didn't actually get underneath my bra, but she was trying to do that." Under the Criminal Code's definition of "sexual conduct," the touching of Guntol's breast through clothing is sufficient to constitute a sexual offense. Furthermore, Guntol testified that while she was walking out of the room, defendant slapped her on the buttocks.

¶ 45     According to the State, defendant's actions with Katie C. also constituted a "sexual offense." Katie C. testified that defendant "grabbed her buttocks," but upon cross-examination, Katie C. acknowledged that she did not know if the touching was intentional. Furthermore, Katie C. testified that when she asked defendant to stop touching her, defendant stopped immediately and did not force any sexual behaviors on her. When speaking with Dr. Killian, defendant denied touching Katie C.'s buttocks. The testimony is insufficient to qualify this interaction as a "sex offense." Therefore, the State provided sufficient evidence of only one incident, with Guntol, as a sex offense.

¶ 46     The State further argues that multiple past sexual offenses are not required to establish a criminal propensity to commit future sex offenses. Instead, the State maintains that the testimony presented by Dr. Jeckel and Dr. Killian was sufficient to establish the second element. Dr. Jeckel diagnosed defendant with borderline personality disorder with some antisocial qualities that "predisposed her to engage in recurrent improper sexual and aggressive activity with women." Dr. Jeckel found "many examples of her having *** intense

sexual needs and aggression." Dr. Jeckel opined that defendant's mental disorder causes a criminal propensity to the commission of sexual offenses and that without treatment, defendant was likely to engage in sexually dangerous behavior in the future.

¶ 47    Dr. Killian opined that defendant "definitely has Attention Deficit Hyperactivity Disorder, and may have a sexual identity disorder, and definitely has an antisocial personality disorder." He described antisocial personality disorder as a disorder "in which the rights of others are repeatedly violated, typically, without remorse." In reaching this conclusion, Dr. Killian noted that defendant had engaged in 12 separate incidents of sexual conduct involving nine different victims, but acknowledged that he was "not in a position to say [the events] occurred" as many of the incidents were reported by defendant's parents only. Finally, like Dr. Jeckel, Dr. Killian concluded that defendant has a criminal propensity to the commission of sex offenses and "is substantially likely to engage in further sex offenses if not confined."

¶ 48    As noted above, this court in *Masterson* required a finding that it is "substantially probable" defendant "will engage in the commission of sex offenses in the future if not confined." Dr. Killian testified as to the 12 other separate incidents of sexual conduct involving 9 different victims. However, no detailed evidence was presented regarding these incidents, and Dr. Killian relied only on reports made by defendant's parents. He did not discuss these incidents with defendant, and there was no record of any charges filed from any of these incidents. The court cannot determine from this limited evidence whether these offenses constituted "sex offenses." Dr. Jeckel's and Dr. Killian's opinions that defendant was likely to commit future sex offenses if not confined, without evidence of additional sex offenses, are insufficient to establish that it was substantially probable that defendant would commit future sex offenses as required by *Masterson*. We find the one incident where defendant attempted to grab Guntol's breast area through her shirt insufficient to establish a substantial probability that defendant will engage in the commission of sex offenses in the future if not confined.

¶ 49            3. Demonstrated Propensities Toward Acts of Sexual Assault or
                        Sexual Molestation of Children

¶ 50    Finally, we consider whether the State showed sufficient evidence to establish that defendant demonstrated propensities toward acts of sexual assault or sexual molestation of children. In *People v. Allen*, 107 Ill. 2d 91, 105 (1985), this court considered the third element and concluded that "the statute requires more than the proof of mere 'propensity'; it also requires that the State prove that the defendant has 'demonstrated' this propensity. This language can only mean that the State must prove at least one act of or attempt at sexual assault or sexual molestation." While the State must show at least one act or attempt at sexual assault or sexual molestation, there is "nothing in the statute requiring the State to prove multiple sex crimes." *Id.*

¶ 51    This court further explained that "the statute is primarily concerned with prediction of the defendant's future conduct; the requirement that the defendant must have 'demonstrated' his propensities means only that the commitment order cannot be based *solely* on psychological speculation. We therefore hold that the plural language of the statute—'acts of sexual assault

or acts of sexual molestation'—refers to the defendant's future propensities, not to the demonstrated conduct." *Id.*

¶ 52      We first consider whether the State presented evidence of either an act of sexual assault or an act of sexual molestation of a child. The SDPA does not define "sexual assault," and in *Allen*, this court looked to the definition of "deviate sexual assault" under the Criminal Code (Ill. Rev. Stat. 1983, ch. 38, ¶ 11-3). Accordingly, the appellate court here looked to the Criminal Code's 2010 definition of "criminal sexual assault." A person "commits criminal sexual assault if he or she: (1) commits an act of sexual penetration by the use of force or threat of force; or (2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent." 720 ILCS 5/12-13 (West 2010). "Sexual penetration" is in turn defined as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." 720 ILCS 5/12-12(f) (West 2010).

¶ 53      The State argues that we should not look to the Criminal Code's definition of "criminal sexual assault" for guidance. First, the State notes that the legislature did not reference the Criminal Code or use language from the Criminal Code in the SDPA. Additionally, the State maintains that this narrow definition of "sexual assault" fails to uphold the legislative intent, as defendants who fondle breasts of adults will be excluded. However, this court found it appropriate to use the Criminal Code's definitions for guidance in *Allen*. Furthermore, as discussed above, the Criminal Code and the SDPA are governed by the same policy, and it is proper to consult definitions in the Criminal Code for guidance in interpreting undefined terms in the SDPA. Therefore, because no evidence was presented that defendant sexually penetrated another individual, the State failed to show that defendant committed an act of sexual assault.

¶ 54      The SDPA also does not define "sexual molestation of a child," and the State cites dictionary definitions of "sexual" and "molestation." "Sexual" is defined as "of or relating to the sphere of behavior associated with libidinal gratification." Webster's Third New International Dictionary 2082 (2002). "Molestation" is defined as "an act or instance of molesting." Webster's Third New International Dictionary 1455 (2002). "Molest" is defined as "to meddle or interfere with unjustifiably often as a result of abnormal sexual motivation." Webster's Third New International Dictionary 1455 (2002). Combining these two definitions, the State concludes that "sexual molestation" of a child is "meddling or interfering with" a child "as a result of abnormal sexual motivation" for the purposes of "libidinal gratification."

¶ 55      In determining the plain, ordinary, and popularly understood meaning of a term, it is entirely appropriate to look to the dictionary for a definition. *People v. Dominguez*, 2012 IL 111336. At the same time, "It is the responsibility of the court when utilizing a dictionary to choose that definition that most effectively conveys the intent of the legislature." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 95 (Garman, J., concurring in part and dissenting in part, joined by Thomas and Karmeier, JJ.).

¶ 56      In reaching this definition, the State leaves out the part of Webster's Dictionary's definition of molestation requiring that the meddling or interference occurs "unjustifiably

often." Therefore, a more accurate version of Webster's Dictionary's definition of "sexual molestation" would be "meddling or interfering with" a child "unjustifiably often as a result of abnormal sexual motivation" for the purposes of "libidinal gratification." However, the plain language of the SDPA never requires that the act of molestation occurs "unjustifiably often" and this requirement is plainly at odds with the SDPA.

¶ 57　　Furthermore, the State's broad definition raises many policy concerns. Acts without any sexual behavior could be considered "sexual molestation," as the definition merely requires "meddling" or "interfering." The only limitation is that the act must be done with an "abnormal sexual motivation."

¶ 58　　The Illinois Administrative Code Rules of the Department of Children and Family Services defines "Sexual Molestation" as "sexual conduct with a child when the contact, touching or interaction is used for arousal or gratification of sexual needs or desires. Parts of the body, as used in the examples below, refer to the parts of the body described in the definition of sexual conduct found in the Illinois Criminal Sexual Assault Act." 89 Ill. Adm. Code 300.Appendix B(21) (2011). As noted above, the Illinois Criminal Sexual Assault Act, contained in the Criminal Code, includes the following body parts in defining "sexual conduct": sex organs, anus, or breast. We find the definition provided by the Administrative Code Rules of the Department of Children and Family Services to more accurately correspond with the legislative intent behind the SDPA.

¶ 59　　Applying this definition of sexual molestation, we consider the evidence presented. Guntol was a teacher and not a child at the time of her interaction with defendant. Dr. Killian testified as to 12 separate incidents of sexual conduct involving 9 different victims, but there was no evidence presented as to the ages of the individuals involved or details of the incidents. Dr. Killian noted only that all victims were within a few years of defendant's age and that defendant was "not preying on small children." The trial court considered the evidence presented on those 12 incidents and noted, "Now I don't know any details whatsoever about those incidents. I don't know what happened or what didn't happen."

¶ 60　　The only remaining incident left to consider was the incident taking place at Grace House with 17-year-old Katie C. As detailed above, Katie C. herself testified that she did not know whether defendant's touching of her buttocks was intentional. Further, Katie C. acknowledged that defendant only touched her one time and defendant stopped as soon as Katie C. asked her to do so. Further, there was no evidence presented that the incident was done as a result of "arousal or gratification of sexual needs or desires" as Katie C. recognized that the touching may have been accidental and defendant denied touching Katie C.

¶ 61　　Without evidence of either an act of sexual assault or acts of child molestation, the State failed to prove the third element, that defendant demonstrated propensities toward acts of sexual assault or sexual molestation of children.

¶ 62　　For the reasons stated, the judgment of the appellate court is affirmed.

¶ 63　　Affirmed.