# Illinois Official Reports

## Appellate Court

---

### *People v. Barnes*, 2017 IL App (1st) 142886

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE BARNES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-2886 |
| Filed | September 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-18773; the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Gavin Quinn, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1        A case involving the senseless and tragic death of an innocent bystander presents a relatively novel question of statutory interpretation on appeal: What does it mean for two or more people to be "acting together" as required to commit the offense of mob action? See 720 ILCS 5/25-1(a)(1) (West 2008). Defendant Tyrone Barnes and an unidentified man shot at each other on the street, resulting in the death of an innocent bystander. A jury acquitted defendant of felony murder but convicted him of armed violence predicated on mob action. The theory of the predicate charge was that defendant and the unidentified man acted together by "participating" in a "gunfight" that the State has likened, both at trial and on appeal, to a "21st century version of a duel" held on the streets of Harvey.

¶ 2        Defendant says that the State failed to prove the predicate charge of mob action beyond a reasonable doubt. The crux of his challenge is legal rather than factual. Specifically, he argues that the "acting together" element requires concerted action—an agreement or common purpose—by the participants. The State says that it needed to prove only that defendant participated in the gunfight, regardless of any agreement or common purpose.

¶ 3        We agree with defendant's interpretation of section 25-1(a)(1) of the mob-action statute. As we explain below, the ordinary meaning and usage of the phrase "acting together," as well as the history and purposes of the statute, indicate that the General Assembly intended the offense to apply only to certain types of joint or concerted action—that is, action pursuant to an agreement or a common criminal purpose.

¶ 4        Given this understanding of the element, no reasonable juror could find that defendant and the unidentified man were acting together. People who shoot at each other act at cross purposes, not with the common purpose or intent required for concerted action. And there is no evidence that defendant ever agreed to be shot at—as though he had agreed to participate in a modern-day duel. The shooting, like so many other episodes of contemporary gun violence, was, quite simply, an attack. Whatever crimes could rightfully be charged based on these events—including felony murder, of which defendant was acquitted—mob action was not among them.

¶ 5        Because we conclude that defendant did not commit the predicate offense of mob action, we reverse his conviction for armed violence.

¶ 6                                                              I

¶ 7        Defendant was tried for the felony murder of Simeon Sanders, predicated on the aggravated discharge of a firearm at Maurice Bivens, and for armed violence predicated on mob action. On the evening of July 9, 2009, defendant exchanged gunfire with an unidentified man in front of Gus Restaurant, a popular neighborhood spot located on Center Avenue near 153rd Street in Harvey. The unidentified man was with Bivens, who recently had a dispute of some kind with defendant. An errant gunshot fired by the unidentified man, and intended for defendant, struck and killed Sanders, a stranger who was passing by the restaurant.

¶ 8        The State presented testimony from two occurrence witnesses: Leroy Henry, who was with Sanders when he was shot, and Lemare Young, who was talking to defendant and some other friends in front of the restaurant when Bivens and the unidentified man arrived.

Defendant testified in his own defense. Together, they presented a largely undisputed account of the facts relevant to the issue before us. Our discussion of those facts will accordingly be brief.

¶ 9     On the evening in question, defendant drove to Gus Restaurant with a friend he identified as "Chris." Defendant parked in front of the restaurant, and Chris went inside to get some food. Young arrived and parked in an alley or driveway just north of the restaurant. Defendant, Young, and a few others congregated around Young's car to talk. At some point during their conversation, defendant saw Bivens, accompanied by a man in black shorts, whom neither defendant nor Young recognized, walking north on Center Avenue toward the restaurant.

¶ 10    Defendant testified that Bivens and some others had recently approached him while he was working on his route, reading meters for the Harvey water department. Bivens confronted defendant about something he had purportedly said to a mutual friend. Bivens told him, "If I see you again, you know what it is." Defendant got into his car and drove away. He later traded routes with another employee, hoping to avoid Bivens, who lived on his original route.

¶ 11    As Bivens and the unidentified man approached 154th Street, the intersection just south of the restaurant, Bivens pointed in the direction of defendant. Defendant told his friends that those were "the guys that said they been looking for me." Bivens and the unidentified man, who had been walking on the sidewalk, went into the street. As they passed 154th Street, the unidentified man lifted his shirt and displayed a gun.

¶ 12    Defendant went to his car and retrieved his gun from the passenger side. He ducked in front of his car, went around to the driver's side, and stood in the street, holding his gun by his side, waiting to see if the unidentified man would shoot. Defendant testified that it might have been possible for him to drive away, but he did not want to leave his friend in the restaurant.

¶ 13    By Young's estimate, the shooting began about 15-20 seconds after the unidentified man had displayed his gun. Young, who was now sitting in his own car, did not see who fired first but believed that the first shot was fired from up the street, by the unidentified man. Defendant testified that the unidentified man shot at him first, as he was near his car door. Defendant fired four or five shots before getting into his car. Defendant and Young both testified that they heard more gunshots as they were driving away, and they nearly crashed into each other.

¶ 14    Sanders was an unintended victim of the shooting. Henry testified that they were walking up Center Avenue together; as they approached the restaurant, Henry noticed some men arguing loudly outside. Suspicious that danger was brewing, Henry suggested that they cross the street to keep their distance from the altercation.

¶ 15    As they were doing so, Henry looked back and saw a man standing in the street, facing the other way and "reaching for his waist." Henry was not clear whether the man was standing in the center of the street or next to a parked car; in any event, he testified that Center Avenue has two lanes of traffic and a parking lane, so that a person standing by a parked car would be close to the middle of the street. Henry saw another person "peeking from behind the building" by an old pay phone where the restaurant bordered a vacant lot to its south.

¶ 16    Henry and Sanders started running diagonally, to the northwest, across Center Avenue. But rapid-fire gunshots quickly began, and Sanders was hit. He collapsed on the sidewalk and died from his gunshot wound. Given their northwesterly path and the orientation of the two shooters—defendant facing south, and the unidentified man facing north—there was no dispute that the unidentified man fired the shot that killed Sanders.

¶ 17    The State's theory, as presented in closing argument and rebuttal, was that defendant and the unidentified man agreed to fight in a duel—a "shootout and a show-down in the middle of Center Street," like "something that you would see at the Okay [*sic*] Corral," or like "what happens in those western movies that we have all watched at some point growing up." The State argued that defendant agreed to the duel by standing in the street, assuming a "stand-off show-down position." Based on "this acting together of shooting at each other and creating this western scene in the middle of Harvey," the State concluded that defendant was guilty of mob action.

¶ 18    Defendant's theory of defense, in turn, was that the unidentified man opened fire on him, and he returned fire in self-defense. For this reason, defense counsel argued, they were not "acting in concert with common purpose," and thus defendant did not commit mob action.

¶ 19    The jury was instructed on defendant's claim of self-defense for felony murder, but not for armed violence. For the mob-action predicate, the jury received the pattern instructions; like the statute, those instructions use, but do not define, the phrase "acting together." See Illinois Pattern Jury Instructions, Criminal, Nos. 19.03, 19.04 (4th ed. 2000). So the jury was never instructed on the meaning of "acting together." The jury found defendant not guilty of felony murder but guilty of armed violence predicated on mob action. Defendant was sentenced to 24 years in prison.

¶ 20                                                        II

¶ 21    Defendant argues for a reversal of his conviction for armed violence, claiming the State failed to prove beyond a reasonable doubt that he committed the predicate offense of mob action. But defendant's argument is premised on his interpretation of the mob-action statute, a question of law. Before we can determine whether the evidence was sufficient to prove a violation of that statute, we must decide what that statute does and does not prohibit. See, *e.g.*, *People v. Ward*, 215 Ill. 2d 317, 324 (2005) (in determining whether evidence was sufficient to prove defendant guilty of possession of harmful materials, question "devolve[d] into an issue of statutory interpretation" as to meaning of term "possession" in statute).

¶ 22    "A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law" that does not "make[ ] the possession or use of a dangerous weapon" an element of the offense. 720 ILCS 5/33A-2(a) (West 2008). Mob action, as charged in this case, was defined at the time as "[t]he use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2008). Among other things, the State had to prove that defendant was one of "2 or more persons acting together" in the use of force of violence.

¶ 23    Thus, the question of law presented: Do two (or more) people "act together" simply by shooting at each other; or does this statutory element require them to have an agreement, or otherwise to share a common purpose or intent?

- 4 -

¶ 24     The requirements of a statutory element are determined by the legislature's intent. *People v. Bywater*, 223 Ill. 2d 477, 481 (2006). The most reliable guide to that intent "is the language of the statute, given its plain and ordinary meaning." *Id.* "In the absence of a statutory definition indicating legislative intent, an undefined word must be given its ordinary and popularly understood meaning." *In re Ryan B.*, 212 Ill. 2d 226, 232 (2004). In construing a statute, we must "consider [it] in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." *People v. Davis*, 199 Ill. 2d 130, 135 (2002).

¶ 25     "Moreover, criminal or penal statutes are to be strictly construed in favor of the accused, and nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute." *Id.* Thus, under the rule of lenity, if a criminal statute is capable of more than one reasonable construction, we must adopt the construction that favors the accused. *People v. Carter*, 213 Ill. 2d 295, 302 (2004).

¶ 26     For the reasons that follow, we agree with defendant that the phrase "acting together" requires some concerted action—some common purpose or agreed-upon course of conduct—among the actors. It is not only a reasonable interpretation of the statute—which would be enough in itself (see *id.*)—but the interpretation that the General Assembly clearly intended. We base this conclusion on the minimal case law on this subject, the plain language of the statute, and a review of the legislative history of the mob-action statute.

¶ 27                                                    A

¶ 28     We begin by examining case law interpreting the meaning of "acting together" under our mob-action statute. Our supreme court has not provided a definitive interpretation of that language, but we are not entirely without guidance from the case law.

¶ 29     The case most directly applicable, albeit of limited precedential value, is the decision of a three-judge federal district court in *Landry v. Daley*, 280 F. Supp. 938 (N.D. Ill. 1968), *rev'd on other grounds sub nom. Boyle v. Landry*, 401 U.S. 77 (1971). The plaintiffs, challenging the mob-action statute as vague and overbroad under the first amendment, sought a permanent injunction in federal district court against its enforcement. *Id.* at 945. The district court enjoined a different subsection of the statute on these grounds, but held that the subsection at issue here, section 25-1(a)(1), was constitutionally valid. *Id.* at 954-55.

¶ 30     The three-judge panel took little time in declaring its understanding of the law: "We see not [*sic*] ambiguity in the phrase 'acting together.' In the context of this provision, it conveys combined, conjoint or concerted action." *Id.* at 954. Though the injunction entered was reversed by the Supreme Court on ripeness grounds (see *Boyle*, 401 U.S. 77), and though this decision is a non-binding decision of a federal court, it obviously supports defendant's interpretation of the language.

¶ 31     As does, to a limited extent, this court's recent decision in *People v. Kent*, 2016 IL App (2d) 140340, ¶ 25, which reversed a conviction for mob action because the State did not prove "a common purpose to disturb the public peace" between defendant and his girlfriend, and thus the evidence was "not sufficient to show that she and defendant were acting together." Kent and his girlfriend had engaged in an argument with his girlfriend's ex-lover, followed by Kent striking and fighting with the ex-lover. *Id.* ¶ 7. But the girlfriend, while engaging in the initial verbal argument, and though appearing to *contemplate* getting involved in the fight, never did. *Id.* ¶ 8. Nor did she assist Kent in the fight in any other way.

*Id.* Because "the court heard no evidence that defendant and [the girlfriend] assisted each other," they "were not acting together" under the statute. *Id.* ¶ 26.

It is fair to note that the court cited no authority for its interpretation of "acting together" as requiring a "common purpose" (*id.* ¶ 25), nor did it engage in any discussion of that conclusion. Much like the three-judge court in *Landry*, the court in *Kent* seemed to regard the matter as obvious.

To be fair, perhaps the parties did not dispute that interpretation in *Landry*. But they do here. The main issue raised on appeal involves competing interpretations of the phrase "acting together." Because the federal decision we have discussed is of limited precedential value, and because the question was not the focus of the decision in *Kent*, an independent analysis of the question is appropriate.

B

Our first order of business in interpreting words in a statute is to determine, if possible, the plain and popularly-understood meaning of the words. *Bywater*, 223 Ill. 2d at 481; *Ryan B.*, 212 Ill. 2d at 232. In doing so, it is "entirely appropriate" to consult the dictionaries. *People v. Bingham*, 2014 IL 115964, ¶ 55.

Generally speaking, the word "together" has many meanings, as it serves both as an adverb and adjective in many different contexts. But when considered, as here, as an adverb modifying an active verb, it has been defined as "with each other," as in "join together" or "add together." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/together (last visited Sept. 7, 2017). It is likewise defined as "by combined action," as in "together we forced the door," including the synonym "jointly." *Id.* Another definition is "into or in relationship, association, business, or agreement, etc., as two or more persons," as in "to bring strangers together." Dictionary.com, http://www.dictionary.com/browse/ together?s=t (last visited Sept. 7, 2017).

The Oxford Dictionary includes a list of synonyms: "with each other, in conjunction, jointly, conjointly, in cooperation, cooperatively, in collaboration, in partnership, in combination, as one, in unison, in concert, concertedly, with one accord, in league, in alliance, in collusion, side by side, hand in hand, hand in glove, shoulder to shoulder, cheek by jowl." English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/together (last visited Sept. 7, 2017). Similarly, Black's Law Dictionary defines "concerted action" as "[a]n action that has been planned, arranged, and agreed on by parties *acting together* to further some scheme or cause, so that all involved are liable for the actions of one another." (Emphasis added.) Black's Law Dictionary 349 (10th ed. 2014).

These definitions suggest a course of concerted action, a collaborative, cooperative effort, something beyond merely being proximate to one another, beyond merely doing the same thing at the same time. Those dictionary definitions are consistent with a lay understanding of that word. Two strangers who happen to be sitting next to each other on an airplane are doing the same thing at the same time, and quite near each other, but we would not describe these strangers as "travelling together." Nor would we describe two strangers, sitting next to each other at the lunch counter of a coffee shop, as "eating together." Such simultaneous or parallel activity is not enough; to be "acting together," an intent to join with others in a mutual pursuit—like the members of a gang—is typically required. See, *e.g.*, *Lanzetta v. New Jersey*, 306 U.S. 451, 456 (1939) (defining " 'gang' " as " 'a company of persons *acting*

*together* for some purpose, usually criminal' " (emphasis added) (quoting Webster's New International Dictionary (2d ed. 1934))).

¶ 39    Thus, an interpretation of the phrase "acting together" as requiring some agreed-upon pursuit or unity of purpose among the actors strikes us as a perfectly reasonable interpretation of the phrase, consistent with its plain and ordinary meaning.

¶ 40    As we have noted, the dictionaries offer plentiful definitions of "together" in the adverbial form, and some of them would suggest a different interpretation, such as "with or in proximity to another person or people," or "into or in one gathering, company, mass, place, or body," neither of which necessarily implies a shared goal or pursuit, but rather a mere physical closeness to one another.[1]

¶ 41    But that contrary interpretation does not deter us for two reasons. First, "[t]he existence of different or alternative dictionary definitions of a word, each of which would make sense in a statute, itself indicates that the term is ambiguous and the statute is open to interpretation." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 132011, ¶ 33. Even if this latter definition of "together," suggesting nothing more than physical proximity, were reasonable, so too are the former definitions that require the existence of an agreed-upon goal or common purpose. As we already noted, when faced with competing, reasonable interpretations of a penal statute, the rule of lenity requires that we adopt the one that favors the defendant. *Carter*, 213 Ill. 2d at 302.

¶ 42    And second, it is hard to imagine that this looser definition of "together"—implying a mere physical proximity, without any agreed-upon goal or pursuit—would be a logical definition for a criminal statute. See 720 ILCS 5/25-1(a) (West 2008) (prohibiting "[t]he use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law"). The law, after all, does not typically criminally punish one person for the actions of another. We do not punish "guilt by association." *People v. Perez*, 189 Ill. 2d 254, 266 (2000). A defendant who is near a criminal actor when the crime occurred, who knew the crime occurred, and who even fled the scene afterward, will not be held criminally accountable for the crime *unless* there is evidence that the defendant intentionally assisted the actor or was part of a "common criminal design or agreement" with the actor to commit the crime. *Id.* at 267-68.

¶ 43    That principle separates being merely present at a crime from being part of an agreement or joint design to commit that crime. The doctrines of accountability, conspiracy, facilitation, or other varieties of complicity liability, are all doctrines that hold one person responsible for the actions of another because of that agreement, because of that concerted action among the actors. See, *e.g.*, 720 ILCS 5/5-2(c) (West 2010) ("When 2 or more persons engage in a common criminal design or agreement," they are legally accountable for each other's "acts in the furtherance of that common design."); 720 ILCS 5/8-2(a) (West 2010) ("A person commits the offense of conspiracy when, with intent that an offense be committed, he or she agrees with another to the commission of that offense."). None of those statutes, however, hold a defendant criminally liable just for being close to someone when that other person commits a crime. *Perez*, 189 Ill. 2d at 266-68.

---

[1] See, respectively, English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/together (last visited Sept. 7, 2017); Dictionary.com, http://www.dictionary.com/browse/together?s=t (last visited Sept. 7, 2017).

¶ 44 So to the extent that the dictionaries supply a definition of "together" that suggests mere proximity between the defendant and another person during the commission of the crime, we cannot accept it as a reasonable construction.

¶ 45 Putting away our dictionaries, we focus on the State's preferred interpretation, as best we can discern it. The State spends most of its brief criticizing defendant's position that "acting together" requires an agreement or common purpose, calling it an "unstated requirement" in the statute and claiming that "there is nothing in the statute that requires the actors to be on the same side of the mob when they act together to disturb the peace."

¶ 46 The State spends far less time—almost none—telling us precisely what it thinks the words "acting together" *do* mean. But from brief references in the briefs and from oral argument, we take the State's argument to be that defendant's conduct fell within the statute because he "willingly participated" in the gunfight.

¶ 47 That was the State's position at trial, as well. In closing argument, noting that the jury would receive no instruction on the definition of "acting together," the State said, in essence, that defendant's mere participation in the gun fight meant he was "acting together" with the unidentified man:

"[W]ere they acting together without authority of law? Of course. They are standing in the middle of a public street shooting at each other ***. Right? So we know that they are doing that.

Now, counsel during his opening statement, I remember him making some comment about how can he be acting together with this man, they are shooting at each other. You are not going to get instruction, despite what counsel tells you just because [defendant] and this other man are shooting at each other, that they are not acting together. Because that's not the law what you were told."

¶ 48 In its rebuttal closing argument, the State said this about the phrase "acting together:"

"You will get the law on mob action, and it says that they have to act together. It doesn't say that [they] have to have a common mindset. It doesn't mean that they have to have a common purpose.

* * *

The law defines the act. And the way that he is charged, the act is the gun fight. The gun fight. You can't have a gun fight with one person. *** You will see, you got [to] have two. What's the old saying, 'You got [to] have two to tango.'

* * *

And so when the defendant decided to take this gun and stand in that street surrounded by that neighborhood and all those other people and start shooting off rounds—and we know he shot at least five times—he was acting in the gun fight.

* * *

So when he participated in that gun fight and he breached the peace by shooting off this gun, he was guilty of mob action."

¶ 49 So the State's position, both at trial and before this court, is that defendant's participation in the gun fight is sufficient to prove that he was "acting together" with the person shooting at him, regardless of any common purpose or advance agreement. No doubt, defendant "participated" in the gunfight. But is participation alone enough? Even if the violence occurs

spontaneously? Even if the two people who are said to be acting "together" are trying to shoot *each other*, not some agreed-upon third person?

¶ 50    To be sure, there is considerable overlap between defendant's and the State's competing definitions. To prove a common scheme is to prove a defendant's "participation" either in the crime itself or in the activities that led up to the commission of the crime. See *id.* at 267 (accountability based on common-scheme theory "may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself"). Every "common scheme" requires some participation, at some stage of the planning or commission of the crime, by the defendant.

¶ 51    But the difference between the State's and defendant's interpretations of "acting together" is borne out by this case. The State's definition would impose criminal liability even when, as here, the two actors each "participated" in the violence but did not have the same criminal purpose when they did so. They were not aiding each other toward a mutual goal. Their goals could not have been more diametrically opposed. They were shooting at each other, not a common victim.

¶ 52    Under the State's interpretation of "acting together," every exchange of gunfire constitutes mob action because every exchange of gunfire necessarily requires the "participation" of two shooters. For that matter, every fight of any kind—with bats, knives, or just fists—would be mob action, no matter how spontaneous, and mattering not one wit that the two individuals were at cross-purposes, not joined in a quest to commit violence against an agreed-upon third party. Trying to hurt or kill each other, in other words, would be considered acting "together."

¶ 53    The fact that the State's interpretation would lead to a broad reading of the mob-action statute does not, by itself, make it wrong or absurd. Ultimately, however, it is not a construction we adopt, for two reasons. First, as we have said more than once, defendant's construction is a reasonable one—at least as reasonable as the State's—and thus it is the one we must adopt. *Carter*, 213 Ill. 2d at 302.

¶ 54    And second, we do not adopt the State's interpretation because, as shown below, it is inconsistent with the legislative history of the mob-action statute.

¶ 55                                                    C

¶ 56    The offense of mob action, in its current form, was first enacted as part of the Criminal Code of 1961. Ill. Rev. Stat. 1961, ch. 38, § 25-1. The legislature intended the offense to provide "a comprehensive codification of the former law regarding" the offenses of riot, rout, affray, unlawful assembly, and mob action. Ill. Ann. Stat., ch. 38, § 25-1, Committee Comments-1961, at 140 (Smith-Hurd 1964). These antecedent offenses, derived from the common law, were designed to address the heightened threats posed to public safety and law enforcement "[w]hen numerous persons confederate against the public peace" in various ways; or in other words, when a group of people acts together toward a common, violent or illegal, end. Model Penal Code, § 250.1 Commentary, at 317-18 (Am. Law Inst. 1980) (explaining rationales for Model Code's offense of riot, namely, "group disorder" or "mob behavior" is "more dangerous and frightening" than "individual misconduct," and "poses special problems for the police"); *cf.* 20 ILCS 1805/83 (West 2008) (authorizing governor to deploy military force when "a time of public disorder and danger" caused or threatened by a "tumult, riot, mob or body of persons *acting together* by force with attempt to commit a

felony, or to offer violence to persons or property, or by force or violence to break or resist the laws of the State" (emphasis added)); 20 ILCS 1815/37 (West 2008) (same).

¶ 57 The purpose of the newly enacted offense of mob action was to eliminate the "technical distinctions" between the antecedent offenses by substituting one "all-inclusive statutory offense in this area." Ill. Ann. Stat., ch. 38, § 25-1, Committee Comments-1961, at 140 (Smith-Hurd 1964). The subsection of the statute charged in this case, section 25-1(a)(1), "incorporates rout, riot, and affray" (*id.*) and will be our focus.

¶ 58 The offenses of riot, rout, and affray all required the participants to have an agreement or common purpose.

¶ 59 First, the offense of riot required that two or more people either "do an unlawful act, with force or violence, against the person or property of another," or else "do a lawful act in a violent or tumultuous manner." Ill. Rev. Stat. 1961, ch. 38, § 504; 4 William Blackstone, Commentaries *140 (reporting same elements of riot at common law).

¶ 60 It was settled, at common law and under the antecedent Illinois statute, that the offense of riot required "a common purpose and concerted action." 4 Charles E. Torcia, Wharton's Criminal Law § 544 (15th ed. 2015); see also 2 Joel Prentiss Bishop, Commentaries on the Criminal Law § 1143 (6th ed. 1877) (riot requires "three or more assembled persons, mutually accomplishing an object, as is calculated to terrify others"). As our supreme court explained, the "universal conception and understanding of the meaning of the word 'riot' " was "a mob or an assemblage of people of threatening attitude, *acting in concert*, with force and violence and determined to accomplish some injury to a person or property in spite of any resistance which might be offered." (Emphasis added.) *Walter v. Northern Insurance Co. of N.Y.*, 370 Ill. 283, 290 (1938); see also *People v. Rudecki*, 309 Ill. 125, 129 (1923) ("riotous and unlawful assembly" is one in which participants share "a common design to do an unlawful act").

¶ 61 The requirement of "acting in concert" was understood to mean that the use of force or violence must be the product of "a *concerted intent* of the perpetrators *to mutually assist one another* against all who should oppose them in the doing of an unlawful act." (Emphases added.) *Walter*, 370 Ill. at 288 (citing 3 Simon Greenleaf, Law of Evidence § 216 (16th ed. 1899)).

¶ 62 Rioters, in short, had to share a common purpose or intent; and for that reason, they were accountable for each other's actions in the course of the riot. *Bell v. Mallory*, 61 Ill. 167, 169-70 (1871) (rioters are "confederates, bent on an unlawful purpose," so that "the unlawful acts of one are the act of all"); see Black's Law Dictionary 369 (10th ed. 2014) ("confederate" is "Someone who helps someone else do something, esp. something secret or illegal; esp. a coconspirator or accomplice").

¶ 63 Second, the offense of rout required that two or more people "meet to do an unlawful act *** and make advances toward it." Ill. Rev. Stat. 1961, ch. 38, § 503; 4 William Blackstone, Commentaries *140 (reporting same elements of rout at common law); see Black's Law Dictionary 1528 (10th ed. 2014) (" 'The word "rout" comes from the same source as the word "route." It signifies that three or more who have gathered together in unlawful assembly are "on their way." ' " (quoting Rollin M. Perkins & Ronald N. Boyce, Criminal Law 483 (3d ed. 1982))).

¶ 64    A rout was more than an unlawful assembly but less than a riot; it required the participants to "perform an act in the direction of their *common purpose*, *i.e.*, they are on their way toward executing their plan," but "because their objective is not yet accomplished, it is not yet a riot." (Emphasis added.) Torcia, *supra* § 543; see also 1 William Hawkins, Pleas of the Crown, ch. 65, § 9 ("If an assembly moves forward towards the *execution of its unlawful design*, it is a rout." (Emphasis added.)) In modern terms, a rout was a substantial step toward a riot, and thus necessarily required the same common purpose or intent.

¶ 65    Third, the offense of affray was committed when two or more people, "*by agreement*, fight in a public place." (Emphasis added.) Ill. Rev. Stat. 1961, ch. 38, § 505. Notably, the Illinois statute departed from the common law—which defined an affray as a fight that *spontaneously* erupted in public—by specifically requiring that the participants had previously *agreed* to fight. *Dougherty v. People*, 5 Ill. 179, 180 (1843) (noting that Illinois "departed very widely" from the common-law definition of affray, which involved an "*unpremeditated* breach of the peace"; instead, the Illinois affray statute "is almost the very reverse" in that an affray is proven "if two or more persons shall, *by agreement*, fight in a public place" (emphases added)).

¶ 66    Thus, under the Illinois statute, an affray was akin to a duel, except that it did not require the use of deadly weapons, nor did it involve the ritualized practice of issuing and accepting a challenge through seconds that was characteristic of dueling. See Ill. Rev. Stat. 1961, ch. 38, §§ 198-206 (defining dueling and related offenses). It simply required a previously agreed-upon "fight." Ill. Rev. Stat. 1961, ch. 38, § 505.

¶ 67    So each of the three offenses that were incorporated into the subsection of the statute under consideration required concerted action of some kind—a common purpose (riot and rout) or an agreed-upon course of conduct (affray)—as an element. Because the legislature's purpose in enacting section 25-1(a)(1) was merely to unify and simplify these antecedent offenses, we see no reason to conclude that the legislature intended to eliminate their common requirement of concerted action. See, *e.g.*, *People v. Jones*, 214 Ill. 2d 187, 199 (2005) ("In general, a statute will not be construed to change the settled law of the state unless its terms clearly require such a construction."). To the contrary, we believe the legislature used the phrase "acting together" to express precisely that requirement in one all-encompassing, intuitive general term.

¶ 68    For all of these reasons, we read "acting together" under section 25-1(a)(1) of the mob-action statute as requiring concerted action—that is, a common purpose or agreed-upon course of action among the "2 or more persons" who engage in "[t]he use of force or violence disturbing the public peace." 720 ILCS 5/25-1(a)(1) (West 2008). Thus, to prove the predicate charge of mob action in this case, the State had to prove that defendant and the unidentified man "act[ed] together" in that they shared a common criminal purpose, or they agreed to a gunfight.

¶ 69                                          III

¶ 70    Having settled on the meaning of "acting together" in the mob-action statute, we must next determine whether the evidence was sufficient to convict defendant beyond a reasonable doubt of violating that statute. We ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*,

229 Ill. 2d 255, 272 (2008). With regard to the credibility of the witnesses and the reasonable inferences to be drawn from the evidence, the trier of fact's findings are entitled to great deference, but they are not conclusive. *Ross*, 229 Ill. 2d at 272.

¶ 71    We must determine whether the evidence proved either (1) a common criminal purpose between defendant and the unidentified man or (2) that defendant and the unidentified man agreed on a course of conduct—namely, here, that they agreed to a gunfight. We will take the questions in that order.

¶ 72    The State does not claim that the shooters were acting with a common criminal purpose, and we find no evidence in the record that would remotely suggest that defendant and the unidentified man shared a common criminal purpose. As discussed previously, two people shooting at each other do not share a common purpose. They have diametrically opposed purposes. Nothing in the record here suggests anything other than the most obvious of intentions—the unidentified man tried to shoot defendant; and defendant, perhaps in self-defense, shot at the unidentified man. Nobody disputes that Sanders was an innocent bystander, not an intended victim, and there is no evidence that defendant and the unidentified man were engaged in a mutual offense against anyone else. They were trying to shoot each other, plain and simple, putting themselves at "cross purposes"—and about as far from concerted action as they could possibly be. See *People v. Peterson*, 273 Ill. App. 3d 412, 420-21 (1995).

¶ 73    In *Peterson*, we held that when two people "spontaneously shoot[ ] at each other," they "act[ ] at *cross purposes*," rather than with the *common* purpose required for accountability. (Emphasis added.) *Id.* In that case, two codefendants started shooting at each other shortly after having words in the street. *Id.* at 414-15. An innocent bystander was hit by an errant bullet, but the evidence did not establish which of the codefendants had fired it. *Id.* at 415. Both codefendants "admitted shooting at each other, but denied intending to shoot" the bystander. *Id.*

¶ 74    In reversing their convictions for aggravated battery with a firearm, we held that there was insufficient evidence to convict either codefendant as the actual shooter, and that there was no evidence of "a community of purpose" that would make the codefendant who did not shoot the bystander accountable for the codefendant who did. *Id.* at 419-21. Obviously enough, people who shoot *at each other* generally do not intend to promote or facilitate each other's criminal acts. See *id.* at 419-20 ("We have found no case where, as in the case at bar, defendants who acted at cross purposes, spontaneously shooting at each other, were held accountable for each other's conduct."). Unless the participants have agreed to a gunfight, as in a duel or affray, an exchange of hostile gunfire is not concerted action. For the same reasons, defendant and the unidentified man did not share a common purpose when they shot at each other.

¶ 75    The State focuses on the second type of conduct—the agreed-upon course of action. The State says that there was evidence of a non-verbal agreement to engage in a gunfight, much like a duel (without the customary trappings) or an affray.

¶ 76    The State does not attempt to argue a *verbal* agreement between the shooters, and our review of the evidence reveals none. Although one of the witnesses, Leroy Henry, testified that he heard bickering in front of the restaurant before the shooting, there was no testimony as to who engaged in the bickering, much less what was said; he said he had no idea on either count. And while the evidence showed that Bivens had threatened defendant on a previous

- 12 -

occasion while defendant was working on his route as a meter reader, there was no testimony that any agreement to a gunfight was made, let alone whether the unidentified man was present to be part of that agreement. The evidence was that Bivens said to defendant, "If I see you again, you know what it is," but there was no testimony that defendant said anything at all in response, much less that the two agreed to duel at some later time. Indeed, defendant said that after receiving that threat, he not only got in his car and drove away, but he changed his work route so he would not return to that location. No reasonable trier of fact could conceivably view any of this as a verbal "agreement" to a gun duel.

¶ 77    For support of its claims that defendant and the unidentified man *non-verbally* agreed to a gunfight, the State cites the following actions: (1) Bivens "pointed at" defendant, (2) the unidentified man in the black shorts "displayed a gun so defendant could see it," (3) defendant walked to his car and retrieved his weapon, and (4) defendant "immediately returned fire" after the unidentified man shot at him. The State also stresses (5) that defendant did not attempt to run, drive away, or call the police. The State views Bivens pointing at defendant, and the unidentified man displaying his gun, as the "challenge," and defendant's retrieval of his weapon and return fire after being shot at as the acceptance of the challenge. A breakdown of the three occurrence witnesses' testimony is necessary to resolve this dispute.

¶ 78    Leroy Henry, the victim's friend, though recounting the tragic death of his friend, had little to say about this particular aspect of the case. He testified that he heard confrontational words exchanged by a group of individuals but did not recall what was said or who said them. At that point, sensing trouble, he and the victim left the area, unfortunately not soon enough. As the State notes, however, Henry did testify that he was familiar with Center Street, and that the street had one travelling lane in each direction and one parking lane in each direction, so that if someone were standing on the street side of a parked car, that person would be standing "[c]lose to the middle" of the street.

¶ 79    Lemare Young, testifying for the State, testified that he was talking to defendant on the night in question outside the restaurant when defendant told him that "somebody was after him," that there was "somebody looking for him." Defendant pointed to the south. Young saw two people, Maurice Bivens and a man dressed in black. The man in black pointed in the direction of defendant and Young, and Bivens and the other man began walking northbound toward them. After Bivens and the man in black approached, Young saw the man in black "lift his shirt and reach for his gun" in his pants. At that moment, Young "turn[ed] around" and headed for his own car. He saw defendant go to the passenger side of defendant's car and retrieve a gun. He did not recall seeing defendant point the gun at the two men but merely hold it as his side.

¶ 80    "About 15, 20 second[s] after [the man in black] lifted his shirt," Young heard gunshots coming from down the street. Young had already reached his car by that point and was crouched down in the seat inside the car.

¶ 81    Defendant, testifying in his own defense, said that he was talking to Young and another friend when he saw Maurice Bivens and the man in black near 154th Street, to his south. The men pointed in defendant's direction and changed direction; they started walking down the street toward defendant. Defendant told Young and the other man, " 'That was the guys that said that they been looking for me.' " Then he saw the man in black "raise his shirt up."

- 13 -

¶ 82    Defendant saw the gun, "and then I went to the passenger side of my car and I got my gun." When asked on cross-examination how close the men were to him at that point, defendant said that they were half-way past the vacant lot that was next to the restaurant where defendant was standing. Defendant testified that he "kind of like ducked" by the driver's side of the car, because he was "trying to see was he fin [*sic*] to pull it out, was at the fin [*sic*] to shoot." He did not have the weapon aimed at the men but held it behind his back. He did not get in the car and drive away, he said, because his friend was inside the restaurant: "I am standing by the driver's side door waiting on the guy that I am with to come out." He was asked by the State why he did not, at least, get inside the car, to which defendant said: "When I was fin [*sic*] to open the door, that's when he pulled the gun out."

¶ 83    After the man in black pulled out his gun, defendant said: "He shot. I shot. I got in the car, and I tried to get up out of there." He estimated he shot four or five rounds but was "not really sure."

¶ 84    The State characterizes this evidence as an agreed-upon, 21st-century version of a duel. We do not see how any reasonable juror could see it as such. First of all, just as the State is correct that there needs to be two people for a gunfight, likewise there needs to be two people to *agree* to a gunfight. There is absolutely no evidence in this record that defendant agreed to a gunfight. There was no testimony, first of all, that defendant had planned anything in advance with Bivens or his companion, the man in black. The evidence shows only that the men happened upon defendant. And even if the men had been deliberately searching for defendant, there is nothing in the record to demonstrate that defendant had been expecting the men, much less that an encounter had been planned in advance.

¶ 85    Nor do we find any evidence that, once the men all came upon each other, a non-verbal "agreement" to a shoot-out somehow blossomed on the spot during this approximately 15- to 20-second interval. Both Young and defendant said that defendant did not retrieve his gun until the man in black displayed his gun, which can only be taken to mean that defendant was reacting to the threat of the handgun by getting his own gun. And defendant testified that he did not shoot or even raise his gun until the man in black fired. There was no evidence from the record to indicate that defendant wanted this gunfight, much less that he "agreed" to it. Within the space of time that the unidentified man displayed his gun until the first shot was fired—15 to 20 seconds—we find nothing in the record that indicates that defendant indicated, verbally or non-verbally, that he agreed to a gunfight.

¶ 86    The State says that Bivens and the unidentified man effectively "challenged" defendant by pointing at him and displaying the weapon, but the evidence showed that the finger-pointing happened before the men changed direction to start walking toward defendant. It seems far more likely that one of the two men was simply indicating to the other that they had seen defendant up the street. And the display of the weapon, while undoubtedly a menacing gesture, could not be reasonably interpreted as a non-verbal "offer" or "challenge" to a gunfight; it seems inescapably clear that it was a menacing gesture and nothing more. Certainly, and more to the point, there was nothing in the record that *defendant* viewed either of these actions as an invitation to a gunfight, much less that he accepted that offer.

¶ 87    There were some discrepancies in the record concerning the exact positioning of defendant, whether he was as close to his car as he claimed, or whether he was closer to the middle of the street and further north. But we do not see how that affects the question before

- 14 -

us. Defendant's precise positioning before the first gunshot was fired does not change the fact that there is no evidence in the record that could remotely support the inference that defendant "agreed" to a gunfight. Rather, the facts of this case seem to resemble so many cases we see of one instance of bad judgment following another, of senseless violence erupting spontaneously and ending tragically.

¶ 88    This was a senseless shooting, spawned by animosity, that resulted in the death of an innocent bystander. It was tragic and unnecessary. But it was not the 21st-century equivalent of a duel. Because the State was required to show that defendant and the other shooter had agreed to a gunfight to show that they were "acting together" in their use of violence, and because the evidence wholly failed to show as much, defendant was not proven guilty beyond a reasonable doubt of the predicate offense of mob action. As such, his conviction for armed violence is reversed.

¶ 89                                                     IV

¶ 90    Defendant's conviction for armed violence is reversed.

¶ 91    Reversed.