Rule 23 order filed
February 1, 2019.
Motion to publish granted
February 15, 2019.

2019 IL App (5th) 170258

NO. 5-17-0258

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 16-CF-1066 |
| | ) | |
| JAMES LOPES, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Presiding Justice Overstreet and Justice Welch concurred in the judgment and
opinion.

**OPINION**

¶ 1    The respondent, James Lopes, appeals the finding, by a jury in the circuit court of

Madison County, that the respondent is a sexually dangerous person. For the following reasons,

we affirm.

¶ 2                                          FACTS

¶ 3    The facts necessary to our disposition of this appeal follow. On April 27, 2016, the State

filed a criminal information naming the respondent as defendant and charging him with three

counts of the Class 4 felony of grooming and three counts of disorderly conduct, a Class C

misdemeanor. Also on April 27, 2016, the State filed a petition, pursuant to the Sexually

Dangerous Persons Act (Act) (725 ILCS 205/0.01 *et seq.* (West 2016)), asking the trial court to

declare the respondent to be a sexually dangerous person. In the petition, the State alleged,

1

*inter alia*, that the respondent had "demonstrated criminal propensities to commit sex offenses" and had "demonstrated propensities toward acts of sexual assault" based upon his behavior: (1) on or about April 22, 2016, April 23, 2016, and April 24, 2016, which included, *inter alia*, approaching multiple young girls and their parents or guardians, speaking with the young girls, and then giving their parents or guardians cards that referenced websites that contained information regarding the respondent's "teachings on sexual conduct between adults and minors," as well as approaching multiple other young girls and making inappropriate and alarming comments to them; (2) on August 16, 2012, at which time the respondent was arrested by authorities in Portland, Oregon, for felony sexual abuse (first degree) and misdemeanor harassment against a victim who was an eight-year-old girl; (3) in posting videos and writings to the internet "which discuss having sex with children, particularly children wearing green"; and (4) in making "admissions" to investigating authorities "of wanting to sexualize children \*\*\*, particularly children wearing green," and stating to authorities, " 'We try to get them when they're 12 and under.' "

¶ 4    On April 29, 2016, the trial judge entered an order which noted, *inter alia*, that the State had elected to proceed under the Act, and that therefore cancelled the respondent's preliminary hearing that was set for May 13, 2016, on his criminal charges, and instead set a case management conference for May 6, 2016. On May 6, 2016, at the case management conference, the trial judge ensured the respondent had a copy of the petition filed under the Act, because the respondent previously did not have a copy. He explained to the respondent that the criminal proceedings were stayed while the petition moved forward, and asked the respondent if he understood. The respondent answered, "Yes, your Honor."

2

¶ 5    Thereafter, the respondent asked to file five *pro se* motions he had drafted, which pertained to, *inter alia*, speedy trial rights, discovery, dismissal of the charges, and suppression of his interviews with investigating officers. The trial judge noted that the motions were "neatly written," and instructed the respondent as to how to file motions in the future, in light of the respondent's incarceration in the county jail. The respondent then requested "law library time," which led to the following colloquy with regard to the respondent's desire to represent himself, which we quote in detail because of its significance to one of the issues raised by the respondent on appeal:

"THE COURT: Well, Mr. Lopes, let's talk about that. So what do you want to do about an attorney, Mr. Lopes? You have the right to be represented by an attorney of your choice. If you could not afford an attorney, the Court would appoint an attorney to represent you for free. You could also represent yourself. So what do you want to do about an attorney, Mr. Lopes?

RESPONDENT LOPES: I want to go according to that stipulation in the law that's never really mentioned like I would like to represent myself, but I would like at the State expense co-counsel. So a lawyer that can handle the stuff that I can't while I am incarcerated because I will need some witnesses.

THE COURT: So explain that to me a little further, Mr. Lopes. Exactly what are you wanting this attorney for?

RESPONDENT LOPES: Exactly what I would want the attorney for? To organize different witnesses that I will need, e-mails that I send out to organize footage of the news of my case, Channel 4 and 5. That's the ones I can think of on hand.

3

THE COURT: Well, so you want to represent yourself primarily. Is that what you are telling me?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: So how old are you, Mr. Lopes?

RESPONDENT LOPES: I am 40.

THE COURT: How far did you go in school?

RESPONDENT LOPES: I graduated.

THE COURT: From high school?

RESPONDENT LOPES: Yes, I also studied about two thousand hours of law.

THE COURT: You studied about two thousand hours of law. Where was that?

RESPONDENT LOPES: Usually in incarcerated situations like this, copying some things. Law interests me. Law is very important to me.

THE COURT: When was that? How recently?

RESPONDENT LOPES: For the last ten years, probably 15 years actually, your Honor.

THE COURT: Have you represented yourself before?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: Under what circumstances? Can you tell me about it?

RESPONDENT LOPES: Usually under misdemeanor cases. I haven't had any felony cases.

THE COURT: What types of misdemeanor cases?

RESPONDENT LOPES: Let's see, usually trespass or obstruction of government operations.

4

THE COURT: Have you ever had a trial?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: And what type of trial was it? Was it a trial before a Judge or a trial before a jury?

RESPONDENT LOPES: It was a trial before a Judge.

THE COURT: And what type of case was that?

RESPONDENT LOPES: That was misdemeanor. These different states they don't—they have the different set up. I forget what the legal term is with it. Usually we have this court case and then they can go to appeal it and go to Supreme. It is a regular case but they are doing a lot across the country. In misdemeanor format they put in another case where you are not allowed six jurors the first time. The appeal is actually starting the first phase of normal court procedures. You know what I mean?

THE COURT: That trial you are talking about, that actually went to a verdict?

RESPONDENT LOPES: Yes.

THE COURT: And the entire time you represented yourself?

RESPONDENT LOPES: Yes, your Honor. I have done it a number of times, two or three.

THE COURT: Do you understand that you will be held to the standards of an attorney if you choose to represent yourself? I can't make exceptions for you under the law. You will be held to the same rules of evidence and procedure that the State is held to. Do you understand that?

RESPONDENT LOPES: Yes, your Honor. That's why I ask for co-counsel so some expertise can help me.

5

THE COURT: Well, you may or may not get co-counsel appointed. I haven't decided that yet, and when you say co-counsel I think we refer to it in Illinois as standby counsel.

RESPONDENT LOPES: Okay.

THE COURT: So you want to be primarily responsible for your representation but you want an attorney there to help you out. So I am going to refer to it as standby counsel. So we haven't answered that question yet, Mr. Lopes. Right now I am making inquiries to determine whether you have the requisite mental capacity to represent yourself. So we will get to the point of deciding whether or not you are afforded standby counsel in a few minutes. So let's go on with some admonitions. I told you the first one. You understand that you are going to be held to the same rules of evidence and same procedures as you would be if you were an attorney. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: Do you understand that a lawyer has substantial experience in training and trial procedure, and obviously the prosecution is represented by an attorney so that may give them somewhat of an advantage over you, as they are represented by an experienced attorney and you are not an experienced attorney. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: You may be unfamiliar with the legal procedures involved in this case. That may allow the prosecutor an advantage. You may fail to make objections to inadmissible evidence and allow evidence that wouldn't otherwise be permitted to come in. You may not make effective usage of such rights as *voir dire* questioning or questioning of prospective jurors. And you also, because you are not an attorney, you

6

may make tactical decisions, while you think may be in your best interests, they may have unintended consequences that you may not realize. Do you understand that, Mr. Lopes?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: Another issue is, if you are representing yourself one issue you will not be able to complain about on appeal is ineffective assistance of counsel. That is usually a very ripe area for appeal. If you represent yourself you will not have that basis to appeal. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: You are also put in an unusual position when you represent yourself in that you have to act in a dual role as both the Defendant or Respondent in the case and the attorney. Normally the Defendant or Respondent sits at the table. They don't speak very much unless they choose to take the stand. If you represent yourself, jurors or Judge will get to know you in a manner differently than they normally would be able to. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: You are incarcerated. You inquired earlier about library time. The library at the jail, I am not completely familiar with it. I have heard from other individuals that it certainly has a little bit to be desired as far as its currency and the books that it has. You are not going to get any special consideration for that. The jail will give you time in the library as they can, and you will be limited to whatever is in the library. Do you understand that?

7

RESPONDENT LOPES: Yes, your Honor. I also know that as representing myself I need to have adequate time and preparation and search material for cases.

THE COURT: Well, that's one down side of representing yourself. That's why I am telling you this. I can't have you transported to the St. Louis University Law School Library to do your research. You are going to be limited to the very limited resources that they have at the jail. The jail is not a law school, and it is not a law library. It is primarily a place where persons are held pending trial. So I am telling you right now that's one of the down sides. That's one of the choices you are making by representing yourself. You are going to be limiting the resources that you have. Do you understand that?

RESPONDENT LOPES: Yes, sir. That should definitely give me some better odds of being able to have co-counsel so I can get them to help with the research and things I would ask the Court.

THE COURT: Another issue that you will have if you represent yourself is you may not be aware of the existence of possible defenses. Therefore you may not use them. You are also in certain respects limited to [*sic*] in your communication abilities with the prosecutor. An attorney normally has regular conversations with the prosecutor about the progress of the case, and they may be able to attempt to resolve the matter in some manner. So you may be disadvantaged in that regard as to—in that regard as well, Mr. Lopes. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: If I do allow you to represent yourself and the case proceeds, at some point there will be a trial in this matter. At that trial or shortly before should you choose to then assert your right to counsel, depending on the timing of that assertion, it

8

may or may not be allowed. So what I am saying, Mr. Lopes, is—I will give you an example. Some persons want to represent themselves up to a certain point, and that point sometimes is the day of trial. So when it is the day of trial or shortly before trial your request to have counsel appointed if you no longer want to represent yourself may or may not be allowed by the Court. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: So with regard to—normally I would explain to someone the range of penalties to make sure they understand the range of penalties. I know you were just given this Petition, Mr. Lopes. Basically what this Petition seeks is that you be remanded to a treatment facility until such time as you would be deemed fit to be released. That can be a short time. It could be the rest of your life. So there is a substantial amount of your liberty at stake here, Mr. Lopes. Do you understand that?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: So, Mr. Lopes, I find that you freely, knowingly and intelligently desire to waive your right to an attorney, and you want to represent yourself. Correct, Mr. Lopes?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: Of course we will bring up the subject of standby counsel. As you sit there right now you want to represent yourself, correct?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: I find that you have the requisite capacity to do so, and I will allow you to proceed as your own attorney. So make whatever argument you want to make

9

right now, Mr. Lopes, as to the issue of standby counsel and why I should appoint you standby counsel.

RESPONDENT LOPES: I should be able to have standby counsel for the old law library information in the law library, the actual time that I can see or get to the information pertinent to my case and study at that particular library, and for—so my standby counsel can get me the adequate information for my case and also be able to arrange better the witnesses and different things, submissions of evidence I may need within this case, your Honor.

THE COURT: Mr. Lopes, the Court is well aware that it has the discretion to appoint standby counsel, and at this point I am going to deny that request. So at this time you will be the only attorney on your case. And knowing that, Mr. Lopes, do you still wish to proceed as your own attorney?

RESPONDENT LOPES: Yes, your Honor.

THE COURT: So we will proceed in that manner."

¶ 6    At the respondent's next hearing, which was held a week later, on May 13, 2016, the trial judge appointed two experts—Dr. Kimberly Weitl and Dr. Mark S. Carich—to examine the respondent, as required by the Act. The respondent participated in the hearing in a rational and coherent manner, and at one point posed a hearsay objection, and a relevance objection, to materials received from a court in Portland, Oregon. He also requested a copy of the "Sex Offender Management Board Act." When asked why he wanted it, the respondent replied, "Because that's what the evaluators have to go by in their questioning and their evaluations of me."

10

¶ 7    The next hearing in this case was held on June 9, 2016, during which the court took up numerous motions that had been filed *pro se* by the respondent. The respondent again participated in a rational and coherent manner, posing objections, withdrawing those of his *pro se* motions that were rendered irrelevant by the staying of the criminal proceedings, and arguing the merits of his remaining *pro se* motions. His *pro se* motion for a jury trial was granted, with the trial judge noting, "that is your right, Mr. Lopes." In support of other motions, the respondent cited various Illinois court cases and made arguments on the basis thereof, including arguments in rebuttal to the State's oral responses to his initial arguments. With regard to some of the respondent's relevance arguments, the trial judge pointed out that regardless of the relevance of some of the evidentiary materials to the respondent's criminal case, the matter currently before the court was the petition filed pursuant to the Act, to which he determined the materials were relevant. Near the conclusion of the hearing, when the respondent asked the State to obtain for him DVD copies of footage of media coverage of his arrest, the trial judge noted the potential pitfalls of the respondent's request and questioned the relevance of the request. The trial judge added:

> "I would say, and this is the first time you've necessarily done it, but I'll remind you, you know, one of the negatives about you representing yourself is you obviously have to make statements on your own in court. And it's possible those statements can be used against you. So, you know, when you're arguing something and if you start talking about facts of other things, maybe the State doesn't know about that, and maybe you're letting them know things that they wouldn't otherwise know, because you're representing yourself and making argument that you believe is proper, which may or may not be proper. So I'll just caution you about that. And that caution continues throughout the

11

case, Mr. Lopes. But I cannot direct the State to produce this. I don't see how it's relevant. They say they don't have it in their possession. There are probably ways that you could obtain that if you wanted to. And I wouldn't—you know, I don't know what it is or I don't know what you would offer it for, but there are ways probably for you to obtain it. But, again, you're representing yourself. One of the things I cautioned you about in representing yourself was that, you know, you're going to be at a disadvantage in this case because of it, Mr. Lopes. You don't know the law. You're not a lawyer. And it's probably—you know, you just don't have the experience or knowledge of the ways you could go about obtaining that. And I'm not here to advise you how to do it or how you can do it. All I can say is that your request to have the State produce these things is denied."

¶ 8    The trial judge began to move on to the next point in one of the respondent's *pro se* motions, then backtracked, stating:

"Mr. Lopes, while we were on the topic I [was] just talking about, I'll also remind you that your decision to represent yourself, it's not—you can always change your mind. I'm not saying you should. That's your choice. We've already gone through that once before. But I don't want you to feel that because you said you were going to represent yourself, I just want to make it clear to you that that is not a set in concrete decision. If at any time you change your mind, you think you want the assistance of an attorney, you want me to appoint someone to represent you, I'll certainly do that. Okay. Go ahead."

The respondent did not respond verbally to the trial judge's admonition. Instead, he moved on to his next point, taking issue with a preliminary evaluation of him conducted by Dr. Daniel J. Cuneo, noting that he never agreed to be evaluated. The trial judge responded:

12

"Well, the issue of Dr. Cuneo's evaluation is somewhat interesting. The defendant's fitness isn't an issue in a sexually dangerous persons petition. So had that been filed immediately, which it almost was, I think it was actually—it's unusual. It was ordered in the misdemeanor cases, filed by Dr. Cuneo in the felony case."

He then asked the State, "But how is Dr. Cuneo's examination or his opinion of Mr. Lopes' competence to stand trial relevant to the State's doctor's evaluations?" The State responded as follows:

"Your Honor, in a review of Dr. Cuneo's evaluation there is other information that's included. It's not just specifically about his fitness. It was apparently ordered by another judge in this county to evaluate him for the purposes of establishing an opinion for fitness to stand trial. But there is other information that is compiled through the course of that interview, through the course of that evaluation, including a diagnosis for Dr. Cuneo's evaluation. So I would argue that all of those things are relevant and probative to doctors evaluating the defendant's propensity underneath the sexually dangerous persons statute, but not necessarily taken into consideration whether he was fit or unfit because that isn't a requirement for the sexually dangerous persons petition. But the other information that had been provided would be important to the doctors, would be relevant to their evaluations, and would be probative to be included for the Court."

Pressed for more detail, the State added:

"In the evaluation, your Honor, the defendant does talk about his church and how he got to the area, his history. It references the church and sexuality, history of alcohol or drug use, which would be relevant to the evaluator's assessment of the defendant, and past

13

interactions with law and interactions with the Courts. So those things would all be relevant and probative to the doctors."

The trial judge confirmed that Dr. Cuneo's report had not been provided to the two experts—Dr. Weitl and Dr. Carich—yet, then reserved ruling on whether it was to be so provided.

¶ 9    The next hearing in the case was held on August 25, 2016. Therein, the trial judge ruled that Dr. Cuneo's report could be provided to the two experts for them to consider as they compiled their reports on the respondent pursuant to the requirements of the Act. As in his previous appearances, the respondent again participated in a rational and coherent manner, as the parties went through his remaining *pro se* motions. With regard to the respondent's motion to access his Gmail account to help him prepare for his trial, the trial judge granted the motion and commented as follows:

"So Mr. Lopes is in custody, he's representing himself, and he has the right to defend himself in whatever manner he thinks is appropriate. He has to have access to his email account in order to do that. The Court's going to order that the State permit him access to his Gmail account for the specific purpose of accessing his sent email folder and printing out whatever emails he wants to print from his sent email folder."

The trial judge then addressed additional motions, with coherent input from both the respondent and the State. When the respondent raised the issue of his access to materials in the law library, and the negative impact that had on his ability to represent himself, the trial judge reminded the respondent that he had previously warned the respondent about that very issue, but that the respondent had persisted in his desire to represent himself, and "clearly persist[ed] in it to this day." The trial judge added:

14

"And it's your absolute right to represent yourself, Mr. Lopes, but I previously informed you as to the negatives. This is one of the negatives, and you're just going to have to deal with the system that the jail has."

The respondent did not indicate a desire to seek counsel, and the hearing continued, moving on to other issues.

¶ 10　The next hearing in the case was held on October 12, 2016. At the hearing, the trial judge indicated that he had received the evaluation reports from Dr. Carich and Dr. Weitl. The respondent indicated that he had received copies of the reports as well. The respondent posed an objection to the reports, and asked for a motion to dismiss, stating, "They used a bunch of information that's not legal to use, like police reports and past *** arrests that [did not result in] convictions." The trial judge stated that he would not entertain oral motions, and that the respondent should put his motion in writing. A trial date in the case was set for December 5, 2016. Thereafter, the trial judge stated, "So, Mr. Lopes, if you want to file any motions, please do so. I'll set them for hearing and we will get that done prior to trial."

¶ 11　An additional pretrial hearing was held on November 30, 2016, at which time additional new motions were handled. As in all previous appearances, the respondent participated in a rational and coherent manner, able to follow all conversations and provide responsive answers when questioned by the trial judge. As the hearing progressed, the respondent stated that he wanted to preserve for appeal all the issues he had raised at previous hearings and the present one, which led to the following colloquy:

"THE COURT: Well, I'm not going to advise you on what you need to do, Mr. Lopes. We've gone through in detail about you representing yourself. You're not a lawyer, you may think you know a lot, but there's a lot a lawyer would know that you

15

don't know and I think you recognize that. I don't understand why you would want to continue to represent yourself when I would gladly appoint you a competent attorney to assist you, but that's your choice, Mr. Lopes. Everything I've seen from your conduct in court, your demeanor, your interactions with me, all still lead me to believe that you are of a mind to be able to do this. I'm not going to say that you are incompetent. I don't see anything to indicate that you are actively suffering from schizophrenia, I don't think you hear voices, you've demonstrated that. I don't think you see things that aren't there. You've always acted appropriately. You seem to be an intelligent gentleman. So again, I will give you some latitude, you know. I told you when I said I'd allow you to represent yourself that in most respects I'm going to treat you as if you were an attorney. There's a little slack that I can give you and I've been giving that to you during these motion hearings by trying to explain things to you. But you are choosing to proceed without an attorney. Do you still want to do that, Mr. Lopes? You don't want an attorney to represent you?

RESPONDENT LOPES: Yes, Your Honor.

THE COURT: Okay. So, you need to do whatever you think you need to do, Mr. Lopes.

RESPONDENT LOPES: Okay."

Thereafter, the trial judge explained in detail to the respondent the procedure that would be followed for the selection of a jury at his trial, and discussed peremptory challenges and challenges for cause. He also explained the procedure for making objections. He asked if the respondent understood everything they had discussed, and the respondent indicated that he did. He then asked the State for input, and the State noted that it needed to request a continuance of

16

the trial, because of the unavailability of one of its material witnesses. Over the objection of the respondent, the trial was continued to January 17, 2017.

¶ 12    On January 17, 2017, the respondent's jury trial began. Of relevance to the first issue raised on appeal by the respondent, the respondent continued to participate in a rational and coherent manner in the various proceedings, including the disposition of motions he filed on that day, the questioning and selection of the jury that afternoon, dealing with a last-minute problem with a juror that led the court, with the respondent's agreement, to dismiss the juror and replace him with the first alternate juror, opening statements (which took place on the morning of January 18, 2017), the examination of witnesses (including himself in his case in chief), a conference on the instructions to be given to the jury, and closing arguments. At all times, he was respectful of the various parties and of the rules the trial judge had explained to him prior to, and during, the trial. Of relevance to the evidentiary issue raised on appeal by the respondent, during the questioning by the State of witness Amanda Armstrong, the following colloquy relating to events that took place near a fountain in Portland, Oregon, on August 17, 2012, between the respondent and an eight-year-old girl that Armstrong was supervising occurred:

"Q. After you went up to them were you able to usher this little girl away?

A. Yes.

Q. Were you able to ask her what happened?

A. Yes, I was.

Q. What did she tell you?

A. She told me that he offered—

RESPONDENT LOPES: Object, Your Honor, this is hearsay evidence.

17

MS. FOLEY: Your Honor, if I may? I believe any statement by this little girl is an excited utterance, and the testimony was that it was an alarming situation and it was merely seconds after it happened and any statements that Mr. Lopes would have made to the little girl would be an admission.

THE COURT: I'm going to need more foundation about an excited utterance, Ms. Foley. Sustained as to excited utterance—or hearsay, I'm sorry.

Q. MS. FOLEY: Thank you, Your Honor. How was this little girl acting?

A. She looked really alarmed and confused obviously, concerned and scared—terrified I would describe it.

Q. So certainly this was an event that she wasn't expecting to happen?

A. No.

Q. How long after this event were you able to ask her what had happened?

A. Immediately.

Q. And did she respond to you immediately?

A. Yes.

Q. What did she say?

A. She said that Mr. Lopes asked her to pull her pants down.

Q. After that happened what did you do next?

A. I tried to draw attention to myself and get somebody to call the police because I was there, like I said, with ten children alone and needed assistance at that point, so several people were able to come—my coworker was at lunch at the time, so that's why I was by myself.

Q. What did this man do after you ushered the little girl away?

18

A. He seemed almost confused as to why I was upset by that happening. He wasn't violent, he wasn't angry, just confused as to why I would be very upset by that."

¶ 13　Later, during his own testimony, the respondent denied that he had asked the young girl in Portland, Oregon, to pull down her pants. At the conclusion of the trial, the jury found the respondent to be a sexually dangerous person under the Act. On January 23, 2017, a hearing was convened wherein the trial judge noted that the respondent had mentioned at the end of his trial that he wished to begin the appeal process, and wherein the trial judge asked the respondent if he still wished to represent himself. The respondent indicated that he wished to have counsel appointed to assist him both with a posttrial motion and with an appeal.

¶ 14　Counsel was appointed, and on July 3, 2017, the case proceeded to a dispositional hearing, as well as a hearing on the posttrial motion filed by counsel. Counsel argued, *inter alia*, that the respondent should not have been permitted to represent himself. The trial judge responded:

"I have stated repeatedly on the record throughout these proceedings that I believe Mr. Lopes does possess the abilities to make that decision, although I advised him numerous times I thought it was a poor decision and not in his best interest. But I think if you look at Mr. Lopes' conduct throughout these proceedings, his conduct during the trial, I think it is clear Mr. Lopes does in fact possess the requisite mental capacity to knowingly and intelligently waive his right to counsel and represent himself. It is his Constitutional right to do so. He chose to exercise that right. I believe it was to his detriment, but nevertheless that was his choice."

Accordingly, the trial judge denied the posttrial motion and proceeded to the dispositional hearing. Pursuant thereto, the Director of Corrections was appointed as the guardian of the

19

respondent's person, and the respondent was committed to the custody of the Director of Corrections for treatment. This timely appeal, filed by counsel appointed to represent the respondent on appeal, followed.

¶ 15                                    ANALYSIS

¶ 16    On appeal, the respondent contends he should not have been allowed to represent himself at trial, and that he "was denied a fair trial due to plain error." With regard to the first point, the respondent acknowledges his fundamental constitutional right to self-representation, but contends that it is clear from the findings of Dr. Cuneo—which led Dr. Cuneo to conclude that the respondent was unfit to stand trial criminally—that the respondent also lacked the mental capacity "to conduct his defense without the assistance of counsel." Accordingly, the respondent contends on appeal, the trial judge should have denied the respondent's request to represent himself and should have instead appointed counsel to represent him. Other than the evidentiary issue the respondent raises as his second point on appeal, discussed in detail below, the respondent does not point to any particular action or inaction that occurred in the course of the respondent's representation of himself that clearly demonstrates he lacked the mental capacity and ability to represent himself. Instead, the respondent essentially urges this court to adopt a blanket rule that once a person is deemed, or even merely suggested,[1] to be unfit to stand trial in a criminal proceeding, that person is incapable of self-representation at any trial, even if the trial is civil in nature, as with proceedings under the Act.

¶ 17    We begin our analysis with the law relevant to proceedings under the Act. To succeed on a petition filed pursuant to the Act, the State must prove the respondent has (1) a mental disorder

_____

[1]As the State aptly notes, because the criminal proceedings in this case were stayed, then nullified following the jury's finding that the respondent is a sexually dangerous person, there was never an official finding by the trial judge that, based upon Dr. Cuneo's report or any other evidence, the respondent was or was not fit to stand trial on the criminal charges. As both parties also aptly note, there is no requirement that a respondent under the Act be fit to stand trial. See 725 ILCS 205/0.01 *et seq.* (West 2016).

20

that has existed for at least one year prior to the filing of the petition, (2) criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. See, *e.g.*, *People v. Bingham*, 2014 IL 115964, ¶ 27; see also 725 ILCS 205/1.01 (West 2016). When, on appeal, a respondent challenges an adverse ruling under the Act, the court of review considers all of the evidence adduced at the respondent's trial, in the light most favorable to the State, and then must determine whether any rational trier of fact could have found, on the basis of that evidence, the essential elements to be proven beyond a reasonable doubt. *Bingham*, 2014 IL 115964, ¶ 30. As the respondent's argument correctly notes, proceedings under the Act are civil in nature. See, *e.g.*, *People v. Lawton*, 212 Ill. 2d 285, 295 (2004). However, because such proceedings may "result in deprivation of liberty and incarceration in the penitentiary for psychiatric treatment," a respondent in such proceedings "must be accorded the same essential protections available to defendants in a criminal prosecution." *Id*. This includes the right to counsel, a right that is derived both from the plain language of the Act (see 725 ILCS 205/5 (West 2016)) and from the United States Constitution. *Lawton*, 212 Ill. 2d at 295. It stands to reason, therefore, that the right to self-representation—enshrined among the rights fundamental to criminal defendants[2]—must also be present to the same extent to a respondent in proceedings under the Act. Accordingly, we conclude that any limits placed upon the right to self-representation in proceedings under the Act must not run afoul of the constitutional protections of that right for criminal defendants.

¶ 18    In *People v. Allen*, 401 Ill. App. 3d 840 (2010), our colleagues in the First District grappled with the parameters, in a criminal prosecution for first-degree murder and home

---

[2]See, *e.g.*, *People v. Nelson*, 47 Ill. 2d 570, 574 (1971) ("The 'right of a defendant to represent himself, when his choice is intelligently made, is as basic and fundamental as his right to be represented by counsel.' " (quoting *People v. Bush*, 32 Ill. 2d 484, 487 (1965))).

invasion, of the right to self-representation of a defendant of questionable mental competence. In *Allen*, the first expert—Dr. Ferguson, a licensed clinical psychologist—to evaluate the defendant found that the defendant was fit to stand trial. *Id*. at 842. The court ordered a second expert—Dr. Kelly, a psychiatrist—to evaluate the defendant thereafter, and Dr. Kelly also found the defendant fit to stand trial. *Id*. at 843. When, several weeks later, the defendant asked to discharge his court-appointed attorney and represent himself, a third evaluation was ordered. *Id*. The third expert—Dr. Nadkarni, also a psychiatrist—also found the defendant fit to stand trial. *Id*. Two months later, a fourth expert—Dr. Lourgos, also a psychiatrist—evaluated the defendant, and found the defendant was not fit to stand trial. *Id*. Dr. Lourgos opined that the defendant " 'appear[ed] to be harboring numerous persecutory delusions' " and that the defendant's court filings were " 'replete with delusional material' " that Dr. Lourgos concluded hampered the defendant's ability to effectively assist his counsel in his defense. *Id*. Following a hearing, the trial judge "ordered Drs. Ferguson, Kelly and Nadkarni to review defendant's *pro se* motions and update their opinions regarding his fitness." *Id*.

¶ 19    Thereafter, a fitness hearing was held, at which the defendant was represented by counsel. *Id*. at 844. Drs. Ferguson, Kelly, and Lourgos testified that the defendant was not fit to stand trial. *Id*. Although all three agreed that the defendant understood the charges he faced, and the court proceedings, they all "questioned whether he would be able to assist in his defense," and "all diagnosed defendant with psychotic delusional disorder." *Id*. Dr. Nadkarni testified that he believed the defendant was fit to stand trial. *Id*. He "based his opinion on the fact that defendant provided rational and logical reasons for his *pro se* motions," and "had written some of the information in his motions based on his anger with how his case was proceeding in court." *Id*. A jury found the defendant unfit to stand trial and he was subsequently treated for six months,

22

without medication, at a state facility. *Id.* Thereafter, Dr. Kelly found the defendant fit to stand trial, concluding that he was able to assist in his defense. *Id*. It does not appear that Dr. Kelly commented on the existence or absence of delusional thinking at that time. See *id*. The trial judge found that the defendant had been restored to fitness and therefore was fit for trial. *Id*.

¶ 20 Several months later, the defendant again asked to represent himself. *Id*. The trial judge admonished the defendant that the defendant would be held to the same standards as would a licensed attorney, and the defendant replied that he understood. *Id*. The trial judge then stated, " 'I believe that because of the motions that you've filed and things that you've done so far, notwithstanding the fact that you were referred to the Department of Mental Health, it appears to me that you may be capable of doing this on your own.' " *Id*. Accordingly, the trial judge dismissed appointed counsel and allowed the defendant to proceed *pro se*. *Id*. However, as the case proceeded, the trial judge again had doubts, stating during a pretrial hearing, " 'I have a *bona fide* doubt once again about whether or not you are fit to stand trial. And, I'm going to have you examined once again. Just to be certain.' " *Id*. at 845. Dr. Kelly again examined the defendant and again found him fit to stand trial. *Id*. The case was transferred to another judge for a jury trial. *Id.* The new trial judge again admonished the defendant regarding self-representation, then allowed the defendant to proceed *pro se*. *Id*. Following the trial, at which the defendant testified on his own behalf, the defendant was convicted of first-degree murder and home invasion. *Id*. at 847.

¶ 21 In light of the foregoing facts, on appeal the *Allen* court examined the United States Supreme Court case of *Indiana v. Edwards*, 554 U.S. 164 (2008), which the *Allen* court noted "concerned whether there was a mental-illness-related limitation on the scope of the right of self-representation" in a criminal case. *Allen*, 401 Ill. App. 3d at 851 (citing *Edwards*, 554 U.S. at

23

171). The court concluded that *Edwards* stood for the proposition "that a defendant's right to self-representation was not absolute and could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation." *Id*. The *Allen* court noted that in the case before it, the trial judge had conducted an in-depth dialogue with the defendant to determine the defendant's desire to represent himself, and competence to do so (*id*. at 852-53), concluding that "[t]he trial judge conducted the matter appropriately based on the information before the court" and was not required to look "beyond the information [the trial judge] was provided and somehow discern unfitness to proceed *pro se*." *Id*. at 853. The court noted that although the defendant made mistakes as he represented himself at trial "as a result of defendant not being an attorney," nevertheless "these deficiencies were not the result of mental incompetence," and the defendant "was able to carry out the basic tasks needed to present his own defense without the help of counsel." *Id*. at 852. The court reiterated: "Defendant was misguided by his own choices, not his lack of mental competence." *Id*. at 853. Accordingly, the *Allen* court concluded that the trial judge did not err in permitting the defendant to represent himself. *Id*.

¶ 22 As the State aptly notes, Illinois courts have consistently held that whether a criminal defendant has effectively waived his or her right to counsel is a question left to the sound discretion of the trial court, and the trial court's decision will be reversed by this court only if the decision constitutes an abuse of discretion. See, *e.g.*, *People v. Griffin*, 305 Ill. App. 3d 326, 329 (1999). It is axiomatic under Illinois law that an abuse of discretion exists only if the trial court's decision is arbitrary, fanciful, or unreasonable to such an extent that no reasonable person would agree with the decision. See, *e.g.*, *People v. Lerma*, 2016 IL 118496, ¶ 23.

24

¶ 23 As noted above, in the case before us on appeal, the respondent urges this court to conclude that *Allen* and *Edwards* support the conclusion that Dr. Cuneo's opinion that the respondent was unfit to stand trial in the criminal case should extend to the civil proceedings under the Act and should, in essence, nullify the individualized determination made by the trial judge in this case that the respondent possessed the requisite mental capacity to represent himself. Specifically, the respondent posits that if previous cases "have found that an individual may well be able to satisfy the mental competence standard to stand trial when represented by counsel, yet may be unable to carry out the basic tasks needed to present his own defense without the help of counsel," then someone such as the respondent "who is found unfit to stand trial should not be allowed to represent himself at trial, even if it is a civil trial in nature." However, as noted above, the respondent in this case was never found to be unfit to stand trial. Accordingly, the respondent's entire argument is based upon a faulty premise—that the respondent was found unfit to stand trial. Moreover, as *Allen* makes amply clear, different mental health experts can have different opinions about an individual criminal defendant's fitness to stand trial, and those opinions are situational and can change with time; *Allen* also makes amply clear that the trier of fact may consider conflicting opinions of mental health experts and make a determination about fitness that is contrary to one or more of those expert opinions. Accordingly, the mere presence of Dr. Cuneo's report is not the equivalent of a judicial finding of unfitness.

¶ 24 In this case, the trial judge was well aware of Dr. Cuneo's report and its conclusion but noted that there was no requirement under the Act that the respondent be fit to stand trial and therefore concluded that the report was of limited utility in the proceedings under the Act. As a result, instead of merely relying on Dr. Cuneo's report—and at the risk of stating the obvious, we reiterate that Dr. Cuneo (who prefaced his report by stating that it was compiled "for the purpose

25

of establishing an opinion as to [the respondent's] fitness to stand trial") was never asked, nor did he *sua sponte* opine with regard to, whether the respondent possessed the requisite mental capacity to represent himself in the proceedings under the Act—the trial judge undertook an individualized, and ongoing, determination, based upon his discussions with the respondent and the respondent's behavior in the courtroom, of whether the respondent possessed the requisite mental capacity to represent himself in the proceedings under the Act. The efforts of the trial judge to safeguard the respondent's fundamental right to self-representation, while simultaneously ensuring the respondent at all times possessed the requisite mental capacity to exercise that right, are documented in detail above. Those efforts were thorough and laudable, and we conclude that regardless of the respondent's mental state when he was interviewed by Dr. Cuneo (and we reiterate that the respondent contended he never agreed to an interview with Dr. Cuneo, which could explain some of the agitation on the part of the respondent during the interview), it is abundantly clear from the record, described in detail above, that in all of the respondent's court proceedings in this case under the Act—as he sought to represent himself, and as he did in fact represent himself—the respondent had the requisite mental capacity to invoke and enjoy his fundamental right to self-representation. Although perhaps one might agree with the trial judge that the respondent would have been served better had he chosen the assistance of counsel with more knowledge of Illinois law and more experience in proceedings under the Act, our review of the record on appeal leaves us confident that the respondent had the requisite mental capacity to make the decision to represent himself. We are convinced, as was the *Allen* court with the defendant in that case, that to the extent the respondent in this case made mistakes in his representation of himself, those mistakes were based upon the respondent's lack of legal knowledge, not his lack of mental capacity. See *Allen*, 401 Ill. App. 3d at 852-53.

¶ 25 Moreover, we agree with the State that the admonishments and questioning of the respondent in this case—had they occurred in a criminal proceeding or a mental health proceeding—would have been sufficient to satisfy the requirements for an effective waiver of counsel in those proceedings. See Ill. S. Ct. R. 401(a) (eff. July 1, 1984) (requirements for waiver of counsel for persons "accused of an offense punishable by imprisonment"); *In re Lawrence S.*, 319 Ill. App. 3d 476, 480-82 (2001) (discussing requirements for effective waiver of counsel in proceedings under Mental Health Code). Accordingly, we conclude the trial judge did not abuse his discretion when he concluded that the respondent had effectively waived his right to counsel in the proceedings under the Act and when he allowed the respondent to proceed *pro se*. See, *e.g.*, *People v. Griffin*, 305 Ill. App. 3d 326, 329 (1999) (trial judge's decision regarding effective waiver of counsel reviewed for abuse of discretion); *Lerma*, 2016 IL 118496, ¶ 23 (abuse of discretion exists only if the trial court's decision is arbitrary, fanciful, or unreasonable to such an extent that no reasonable person would agree with the decision).

¶ 26 With regard to his second point on appeal, the respondent contends he "was denied a fair trial due to plain error," because he alleges that the only evidence that established the third element of the State's claim that the respondent is a sexually dangerous person—that the respondent has demonstrated his criminal "propensities toward acts of sexual assault or acts of sexual molestation of children" (see 725 ILCS 205/1.01 (West 2016))—was admitted erroneously, but without objection from the respondent. Specifically, the respondent contends that evidence consisted of the testimony of Amanda Armstrong that on August 17, 2012, an eight-year-old girl who allegedly had been accosted by the respondent near a fountain in Portland, Oregon, told Armstrong that the respondent asked the girl "to pull her pants down." As described above, the respondent posed a hearsay objection when the State first attempted to elicit

this information from Armstrong. The State posited that the statement would qualify as an excited utterance, and thus would constitute an admissible exception to the hearsay doctrine. The trial judge responded, "I'm going to need more foundation about an excited utterance, Ms. Foley. Sustained as to excited utterance—or hearsay, I'm sorry." The following colloquy then occurred:

"Q. MS. FOLEY: Thank you, Your Honor. How was this little girl acting?

A. She looked really alarmed and confused obviously, concerned and scared—terrified I would describe it.

Q. So certainly this was an event that she wasn't expecting to happen?

A. No.

Q. How long after this event were you able to ask her what had happened?

A. Immediately.

Q. And did she respond to you immediately?

A. Yes.

Q. What did she say?

A. She said that Mr. Lopes asked her to pull her pants down."

¶ 27    It is well established that in Illinois, a party that wishes to invoke the plain error doctrine bears the burden of persuasion. See, *e.g.*, *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The first step in determining if plain error exists is to determine if any error occurred at all. See, *e.g.*, *People v. Taylor*, 2011 IL 110067, ¶ 30. In this case, there was no error, and thus the respondent's attempt to invoke the plain error doctrine fails. After the trial judge sustained the respondent's hearsay objection, noting that he needed more foundation to determine if the excited utterance exception applied, the State provided that foundation, quoted above. As the respondent may well have realized, any further attempt by the respondent to object to

28

Armstrong's testimony on the basis of hearsay would have been futile, and the admission of that testimony by the trial judge was not erroneous. See, *e.g.*, *People v. McCoy*, 2016 IL App (1st) 130988, ¶ 92 (excited utterance exception to hearsay rule satisfied if (1) occurrence sufficiently startling to produce spontaneous and unreflecting statement, (2) absence of time for declarant to fabricate the statement, and (3) statement related to the circumstances of the occurrence; relevant factors to consider include time, nature of event, mental and physical condition of declarant, and presence or absence of self-interest; time factor varies greatly, as critical inquiry with respect to time is whether statement was made while excitement of event predominated). Where, as here, there is no initial error at trial, there can be no plain error. *Herron*, 215 Ill. 2d at 187.

¶ 28                                    CONCLUSION

¶ 29    For the foregoing reasons, we affirm the jury's finding that the respondent is a sexually dangerous person and affirm his commitment to secure care and treatment in the Illinois Department of Human Services.


¶ 30    Affirmed.

2019 IL App (5th) 170258

NO. 5-17-0258

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 16-CF-1066 |
| | ) | |
| JAMES LOPES, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

**Rule 23 Order Filed:** February 1, 2019
**Motion to Publish Granted:** February 15, 2019
**Opinion Filed:** February 15, 2019

_____

**Justices:**      Honorable James R. Moore, J.

Honorable David K. Overstreet, P.J., and
Honorable Thomas M. Welch, J.,
Concur

_____

**Attorneys**
**for**
**Appellant**

Donna S. Polinske, Brian L. Polinske, Polinske & Associates, P.C., 701
North Main Street, Edwardsville, IL 62025

_____

**Attorneys**
**for**
**Appellee**

Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse,
157 North Main Street, Suite 402, Edwardsville, IL 62025; Patrick
Delfino, Director, Patrick D. Daly, Deputy Director, Kelly M. Stacey,
Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730
East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____